16 P.3d 626 (2001)
142 Wash.2d 904
STATE of Washington, Petitioner,
v.
Negash ATSBEHA, Respondent.
No. 68649-1.
Supreme Court of Washington, En Banc.
Argued September 26, 2000.
Decided February 1, 2001.
*627 Norm Maleng, King County Pros., Ann Summers, Deputy King County Pros., Seattle, for Petitioner.
Nielsen, Broman & Associates, Eric Broman, David Koch, Seattle, for Respondent.
SMITH, J.
Petitioner State of Washington seeks review of a decision of the Court of Appeals, Division One, which reversed the King County Superior Court conviction of Respondent Negash Atsbeha for possession of a controlled substance with intent to deliver under RCW 69.50.401(a)(1)(i). The Court of Appeals reversed the trial court, concluding that it erred in excluding the testimony of a physician offered by Respondent as an expert witness because it was not material and relevant to his defense of diminished capacity.[1] This court granted review. We reverse.

QUESTION PRESENTED
The question presented in this case is whether expert testimony of a physician, offered by Respondent, but excluded by the trial court, was relevant and material and should have been allowed to establish Respondent's diminished capacity defense against the crime of possession of a controlled substance with intent to deliver under RCW 69.50.401(a)(1)(i).

STATEMENT OF FACTS
On October 28, 1997, Respondent Negash Atsbeha was charged in the King County Superior Court by amended information *628 with one count of unlawful delivery of a controlled substance, and in the alternative, one count of possession of a controlled substance with intent to deliver.[2] Both counts involved violation of the Uniform Controlled Substances Act under RCW 69.50.401(a)(1)(i) and RCW 69.50.435(a)(3).[3] The charges arose from an encounter between Respondent and King County Detective Michael Caldwell on March 28, 1996 on Aurora Avenue North in King County.
The "Certification for Determination of Probable Cause" provided in part:
On March 28, 1996, King County Detective Caldwell contacted the defendant, NEGASH ATSBEHA, in the parking lot of Joker[']s Tavern and Card Room, 14515 Aurora Avenue North, King County, Washington. Detective Caldwell was working undercover. The defendant agreed to sell one sixteenth of an ounce to Detective Caldwell for $80. Detective Caldwell gave the defendant $80. Ten minutes later, the defendant returned to Detective Caldwell's car and gave the detective a plastic bag containing suspected powder cocaine. The Washington State Patrol Crime Lab tested the contents of the plastic bag and determined that it contained cocaine....[[4]]
On February 17 and 18, 1998, the Honorable Patricia H. Aitken held pretrial hearings to determine the admissibility of testimony offered by Respondent. Judge Aitken asked whether Respondent would raise the defense of insanity. His counsel answered he would not.[5] Petitioner instead chose to present only the defense of diminished capacity, relying upon the testimony of Dr. Mary Hodgson Rose, M.D. During the extensive pretrial hearing, Dr. Rose responded to questions by the trial court, Deputy Prosecuting Attorney Cindi S. Port and Respondent's counsel Matthew M. Rubenstein, which included the following:
Q. [by Mr. Rubenstein] Good morning, Dr. Rose. Could you state your name and spell your name for the court reporter.
A. Yes, it is Mary Hodgson Rose, H O D G S O N, no hyphen, Rose, R O S E.
....
Q. Okay. Could you share with us your education.
A. Yes, I did my undergraduate work at Stanford University and got my medical degree there. I did my post-graduate training in British Columbia at the University of British Columbia Hospital, which is Vancouver General....

*629 Q. What board certification do you have?
A. In family medicine. I am recertified in those every six years.
Q. And are you involved in any continuing medical education?
A. Yes, I have to take hundreds of units of credits, that's credit hours every year, to maintain my certification. I also am on the clinical faculty at the University of Washington, and am an assistant clinical professor there....
....
Q. Dr. Rose, you indicated that Negash Atsbeha has been your patient since 1986?
A. That's correct.
....
A. The precise condition that Mr. Atsbeha was suffering from was this syphilitic encephalopathy.
Q. And could you describe that in lay terms what that illness, in fact, is and how it physically affects the brain.
A. It is an infection of the brain tissues. And this organism actually enters the nerve cells and cause [sic] both dysfunction and destruction of cells. It particularly affects the frontal lobes that control reasoning and judgment, and the posterior columns of the spinal cord that control gait and balance,. [sic] But it affects all parts of the nervous system, and the skin as well, which is embriologically [sic] related to the nervous system.
Q. Would it be fair to say that it causes diffuse organic brain damage?
A. Yes, it would.[[6]]
....
Q. [by Ms. Port] ... When you last saw him on October 6th of 1995, to the point in time when you saw him in April and May of 1996, can you say with any reasonable medical certainty that his mental disorder connected with the syphilous [sic] had deteriorated to any appreciable degree?
A. I don't believe it had during that time interval.
Q. So what was it that caused Nick to go downhill from late 1995 to early 1996?
A. Major depression and substance abuse.
Q. And which would you say would be the primary and which would you say would be the secondary?
A. The major depression, I must comment that the brain injury with which he was left, left him very impulsive, the consequence of impulsive chaotic behavior, continued to escalate and damage the quality of patients' lives, especially if they are in an unstructured situation, and so the consequence of his syphilitic encephalopathy were by no means gone or stable, even though the germs were gone.
Q. All right. Now, would you say from the time period of late 1995 to early 1996, that the cocaine and alcohol addiction exacerbated his depression?
A. Yes.
....
THE COURT: ... [W]hat did the defendant tell you about the events of that evening, of March 28th, please, when he could give a coherent account[?]
THE WITNESS: When Mr. Atsbeha was able to tell me about this event, he described that he was sitting in a bar where he often goes, and where there was a police officer whom he had known for some time to be a police officer, who offered to buy him several drinks. Nick was out of money at that time, had no ability to supply himself with further alcohol. He drank the drinks, and then by his account, the police officer asked him to buy a small amount of cocaine from a dealer in order to entrap the dealer so that he could be arrested. And as Nick has assisted police officer in a number of circumstances before, he was willing to do this, and expected the drug dealer to be arrested. He made the purchase, bought the cocaine, $10 worth of cocaine back to the police officer, and reported to me that the police officer said, "I'm going to give it to you."
*630 THE COURT: May I ask, then, how you can say he didn't have the intent to deliver when he said he did delivered [sic]?
THE WITNESS: I think his intent to [sic] was to deliver to the police officer.

....
Q. [by Ms. Port] How could you, if that story was given to you, say that he could not perform the simple task when asked by whomever to go get an object and deliver it to that person?
A. I believe the original question was whether he could perform thewhether he could form the intent to perform an illegal act.
Q. I'm not asking you that question, ma'am. I'm not concerned whether Mr. Atsbeha understood whether he was a police officer at that point in time, and I'm not asking you whether he could form the intent that it was an illegal act. I'm merely asking you the hypothetical question, if he, Mr. Atsbeha, in late March of 1996, could form the specific intent when asked to go get an object and bring it back to a person.
A. I think it is very likely he could, however, I was not there, I had no direct contact with his circumstances, and I am reporting what was told to me by my patient in my examining room.
....
THE COURT: ... [I]n your opinion, he would have, based on what he told you and your knowledge of him, would he have, on March 28th, the ability to perform, intentionally deliver an object to a person.

A. I believe he would have been able to respond to a request to buy something and give it to another person.[[7]]
The trial court determined Dr. Rose was qualified to testify as an expert,[8] but nevertheless excluded her testimony with the following explanation:
THE COURT: ... As I understand it, in State versus Edmon[ ], there must be some testimony that the person wasn't able to form the intent. In other words, in that case, they speak to an inability to form the intent, and that is what is meant by "diminished capacity," as I understand it. In other words, what is listed there is the defendant lacked the ability to form the specific intent, and here there is no evidence that we have before us that he lacked the specific intent to be able to deliver an object from one person to another. In fact, she said it was very likely that he could.
So I would find that it was notthe testimony of the lack the ability to form the specific intent to deliver cocaine, in fact, the defendant told her that hethe police asked him to obtain cocaine, he was willing to do it, and he made a purchase which would certainly indicate an ability to form the intent. There is nothing here that indicates that he was intoxicated at the time. Apparently, the police officer, according to him, according to this statement, had gave [sic] him something to drink, but that was the extent of it. So according to Edmon[ ], you must have the witness who is testifying in this matter be able to say that to a reasonable medical certainty, the person was unable to form a specific intent, not just reduced perception over reaction or other irrelevant mental states. So I mean, with this witness saying it is very likely he could form the intent at the time, I just don't see how this case goes to the jury on this, especially as it is going to be the defendant's position that he did do this and could form the intent, as I understand it, that he was an agent of the police. In other words, what the defendant is saying is, as I understand it, is that he was an agent of the police in doing it, and therefore, even though he had the intent, he was not doing it unlawfully because he was an agent of the police.
That's my understanding of the defense in this matter, and I think what the defense is trying to do is have Dr. Rose testify that the defendant is confused about the identity of people, and therefore, because of his organic brain damage, his *631 major depression, and substance abuse, he had a delusional intent to lawfully deliver, but that is not specific intent. That is what I would find to be insanity.
So the testimony of Dr. Rose will not be admitted. The defendant can certainly testify as to his perception and what he did and how much he had to drink, but I don't find that this has met the requirement for diminished capacity.[[9]]
The case proceeded to trial before a jury in the King County Superior Court on February 18, 1998. On February 23, 1998, the jury found Respondent "guilty" of possession of a controlled substance with intent to deliver.[10]
On April 20, 1998, Respondent Atsbeha filed a notice of appeal to the Court of Appeals, Division One.[11] On July 19, 1999, the Court of Appeals, the Honorable Faye C. Kennedy writing, reversed the conviction and remanded the case for a new trial.[12] It concluded the testimony of a medical expert witness, offered by Respondent and excluded by the trial court, was material and relevant to a diminished capacity defense and should have been allowed:
In this case, if Atsbeha believed that he was helping the police capture a "main" drug dealer, that beliefeven though irrationally formed because of the very nature of his profound disorderwould indeed negate specific intent, that is, acting with the objective to produce a result that constitutes a crime, even though Atsbeha could, according to Dr. Rose, respond to a request to do a physical act, that is, to buy something and give it to another person right away.[[13]]
On September 16, 1999, Petitioner State of Washington filed a petition for review with this court. Review was granted on February 29, 2000.[14]

DISCUSSION

STANDARD OF REVIEW
Admissibility of evidence generally is within the sound discretion of the trial court.[15] On February 18, 1997, the King County Superior Court concluded that Dr. Mary Hodgson Rose, M.D., was qualified to testify as an expert, but nevertheless excluded her testimony as neither relevant nor material to a diminished capacity defense. This court will not reverse a trial court's decision absent an abuse of discretion, which occurs only when no reasonable person would take the view adopted by the trial court.[16]
Petitioner State of Washington asserts the trial court in this case did not abuse its discretion in excluding the testimony of Dr. Rose.[17] Petitioner does not challenge her qualifications as an expert witness, she having served as Respondent's family physician since 1986 and being board certified in family medicine. Petitioner claims only that Dr. Rose's testimony is not relevant to the defense of diminished capacity.

DIMINISHED CAPACITY DEFENSE
To maintain a diminished capacity defense, a defendant must produce expert testimony *632 demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged.[18]
In State v. Ellis defendant was charged with two counts of aggravated first degree murder for the deaths of his mother and half-sister.[19] The culpable mental state for that crime was "premeditated intent to cause the death of another person."[20] Defendant filed a motion to admit expert testimony on diminished capacity by Dr. Lloyd I. Cripe, Ph.D., a clinical neuropsychologist, and Dr. Mark B. Whitehill, Ph.D., a clinical and forensic psychologist.[21]
Defense expert Dr. Cripe testified that defendant suffered from an antisocial personality disorder and impulse control disorder.[22] When asked by defense counsel how those mental disorders causally related to lack of intent, he responded:
[Defendant Ellis] is in a situation where certain stressors arise. And given the weaknesses in his psychological makeup, the mind is overpowered basically by there is a breakdown in the deliberation process, in forming judgments and decisions, and the person ends up acting from disarray and from confusion and emotional forces, rather than from a deliberate forming of intent.... [[23]]
Dr. Cripe stated that he believed defendant did not act with intent partly because "it's not very common that human beings kill their mothers and little sisters. This is an extraordinary thing.... I mean people who plan and deliberately kill people, like hit men, don't do it with breadboards."[24]
Defense expert Dr. Whitehill testified that Defendant Ellis suffered from a borderline personality disorder and intermittent explosive disorder.[25] He testified that those disorders would result in "emotional discontrol" to compromise defendant's perceptional process, his decision-making capacity and his ability to properly regulate his behavior.[26]
The State filed a motion in limine to exclude or limit the testimony of Dr. Cripe and Dr. Whitehill.[27] The Pierce County Superior Court granted the State's motion and denied defendant's motion, relying upon the nine foundational criteria announced in State v. Edmon,[28] a 1981 Court of Appeals case.[29] In reversing the trial court's decision to exclude expert testimony on diminished capacity, this court concluded that the foundational criteria announced in State v. Edmon were not absolute and were not controlling.[30] It instead concluded that admissibility of expert testimony concerning the diminished capacity defense should be determined under ER 401, ER 402 and ER 702.[31]

RETROACTIVITY OF STATE v. ELLIS
In this case, the King County Superior Court's decision on February 18, 1998 to exclude Dr. Rose's testimony was made prior to our decision in State v. Ellis on October 1, 1998. The trial court thus could rely upon *633 the nine foundational criteria announced in State v. Edmon, a Division One case. The rule announced in State v. Ellis, a capital case, may nevertheless be applied to noncapital cases such as this one.[32]
This court considers three factors outlined in Chevron Oil v. Huson in determining whether an appellate decision applies prospectively or retroactively: (1) whether the decision establishes a new rule of law by overruling clear past precedent or deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether retroactive application would further or retard the purposes of the rule; and (3) whether retroactive application would be inequitable.[33]
Employing the Chevron Oil test favors retroactive application of State v. Ellis to facts antedating its pronouncement. Determining the admissibility of Dr. Rose's testimony under ER 401, ER 402 and ER 702 instead of under the Edmon criteria would not be inequitable because those rules of evidence have been in effect since April 2, 1979 before State v. Edmon was decided on January 5, 1981.[34] While the trial court in this case properly relied upon State v. Edmon as precedent, the 1981 Court of Appeals decision should not be "elevated to the status of the last, absolute and definitive word on foundational requirements for presentation or admissibility of expert testimony on diminished capacity."[35] The better approach is that announced in the 1998 cased of State v. Ellis. The relevant inquiry thus is whether Dr. Rose's testimony was admissible under ER 401, ER 402 and ER 702.
ER 401 defines "relevant evidence":
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
ER 402 provides:
All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible.
ER 702, referring to expert testimony, provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Under ER 702, expert testimony will be considered helpful to the trier of fact only if its relevance can be established.[36] "[I]t is not enough that ... a defendant may be diagnosed as suffering from a particular mental [disorder]. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime."[37] The opinion of an expert concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged.[38]
In this case, Dr. Rose's testimony was neither relevant under ER 401 nor helpful to the trier of fact under ER 702. To satisfy *634 either rule of evidence, her testimony must have the tendency to make it more probable than not that defendant suffered a mental disorder, not amounting to insanity, that impaired the defendant's ability to form the culpable mental state to commit the crime charged. Respondent was charged with possession of a controlled substance with intent to deliver under RCW 69.50.401(a)(1)(i). The statutory elements for this crime include (1)unlawful possession of (2) a controlled substance (3) with intent to deliver.[39] The culpable mental state is intent to deliver. Under RCW 9A.08.010(1)(a), "[a] person acts with intent or intentionally when he acts with the objective or purpose to accomplish a result which constitutes a crime."
The testimony of Dr. Rose did not reasonably relate to impairment of Respondent's ability to form the intent to deliver the controlled substance. She testified that Respondent was diagnosed as suffering from syphilitic encephalopathy, major depression and substance abuse problems. She further testified how syphilitic encephalopathy pathologically affected Respondent's brain. Despite his diagnosed disorders and pathology, Respondent still had the ability on March 28, 1996 to form the requisite culpable mental state. When asked whether Respondent could form the intent to deliver an object to a person, Dr. Rose responded "I believe he would have been able to respond to a request to buy something and give it to another person."[40] She further stated "I think his intent to [sic] was to deliver to the police officer."[41] Judge Aitken considered this testimony as evidence that Respondent's ability to form the intent to deliver was not impaired. She did not abuse her discretion under the test that no reasonable person would reach a conclusion contrary to that reached by the trial court.
The Court of Appeals correctly noted the traditional rule that evidence of diminished capacity could negate specific intent but not general intent.[42] It also correctly noted the traditional rule was abolished by legislative enactment of RCW 9A.08.010 with the result that expert testimony regarding a defendant's mental disorder should no longer be excluded or admitted on the basis of common-law distinctions of intent.[43] In reversing the trial court, however, the Court of Appeals distinguished between Respondent's ability to form "specific intent" and "his ability merely to respond to a request to perform a physical act within a short period of time."[44] Perhaps unintentionally, the Court of Appeals resorted to common-law distinctions of specific intent and general intent in determining admissibility of Dr. Rose's testimony. The term "specific intent," as defined by the Court of Appeals, is the intent to produce a result in addition to the intent to do the physical act which the crime requires.[45] The term "general intent" is the intent to do the physical act which the crime requires,[46] which in this case entailed "respond[ing] to a request to perform a physical act within a short period of time."
The Court of Appeals also stated "[I]f Atsbeha believed that he was helping the police capture a `main' drug dealer, that beliefeven though irrationally formed because of the very nature of his profound disorderwould indeed negate specific intent, that is, acting with the objective to produce a result that constitutes a crime, even though Atsbeha could, according to Dr. Rose, respond to a request to do a physical act, that is, to buy something and give it to another person right away."[47] Any belief by Respondent concerning his relationship with the police officer, however, was not evidence of impairment of his ability to form the intent *635 to deliver the controlled substance. It was some indication that Respondent also had the ability to form an intent to help Detective Caldwell catch a main drug dealer. This evidence would be relevant and admissible to establish an insanity defense under RCW 9A.12.010,[48] but not relevant and admissible to establish a diminished capacity defense. Petitioner's belief, as indicated by Dr. Rose's testimony, would be some evidence under an insanity defense of his inability to perceive the nature and quality of the act with which he was charged. Respondent chose not to raise the defense of insanity when the trial court offered the opportunity.
The trial court properly excluded the testimony of Dr. Rose offered to establish the defense of diminished capacity.

SUMMARY AND CONCLUSIONS
Admissibility of evidence generally is within the sound discretion of the trial court. Absent an abuse of discretion, this court will not reverse the trial court's decision to exclude expert testimony of a physician offered to establish a diminished capacity defense.
To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged. Admissibility of such testimony is determined under ER 401, ER 402 and ER 702. Under ER 702, expert testimony will be considered helpful to the trier of fact only if its relevance can be established. Relevant evidence, as defined under ER 401, is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
It is not enough that a defendant may be diagnosed as suffering from a particular mental disorder. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime. The opinion concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged.
The culpable mental state for the crime of possession of a controlled substance with intent to deliver under RCW 69.50.401(a)(1)(i) is intent to deliver. The relevant inquiry in this case is whether the diagnosed disorders of syphilitic encephalopathy, major depression, and substance abuse problems impaired Respondent's ability to form the intent to deliver. Dr. Mary Hodgson Rose, M.D., Respondent's expert witness, testified in a pretrial proceeding that Respondents could form the intent to deliver the controlled substance to the police officer and could respond to a request to buy something and give it to another person. The trial court considered her testimony as evidence that, notwithstanding Respondent's mental disorders, his capacity to form the intent to deliver was not diminished. The trial court did not abuse its discretion under the test that no reasonable person would reach the conclusion it reached. The testimony of Dr. Rose was properly excluded by the trial court as not being relevant to the defense of diminished capacity.
We reverse the decision of the Court of Appeals, Division One, which reversed the conviction of Respondent Negash Atsbeha in the King County Superior Court for possession of a controlled substance with intent to deliver under RCW 69.50.401(a)(1)(i).
MADSEN, IRELAND, BRIDGE, JJ., GUY, J.P.T, and TALMADGE, J.P.T., concur.
*636 SANDERS, J. (dissenting).
The issue is whether evidence of brain damage is relevant to establish diminished capacity to form criminal intent. We are not speaking of psychobabble about an alleged mental illness, sometimes more in the mind of the witness than the defendant, but rather a demonstrable physical assault upon brain tissue. I posit: If this isn't relevant to diminished capacity, what is?
The trial court and the majority entirely miss the point of this case when they premise their analysis of diminished capacity upon a search for mere intent to physically deliver. Majority at 635. Of course the defendant "intended" to hand the drugs over to the policeman in the sense his physical actions were volitional. But that doesn't end the inquiry, nor hardly even begin it.
Rather the question here is whether the defendant so acted "with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). If his mental capacity was so diminished he thought he was making the delivery as an agent for law enforcement, then his act, intended and volitional in a physical sense, was not "intended" to commit a crime. Therefore competent evidence relevant to prove the asserted diminution of mental capacity to form that criminal intent is admissible.
This is more than merely an evidentiary question. Included within the right to present a defense is the right to offer the testimony of witnesses. As this court observed in State v. Maupin, 128 Wash.2d 918, 924, 913 P.2d 808 (1996), "`The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.... This right is a fundamental element of due process of law.'" (quoting Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).
Naturally this right does not extend so far as to permit a criminal defendant to introduce evidence irrelevant to his defense. See Maupin, 128 Wash.2d at 924-25, 913 P.2d 808 ("`[A] criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense.'" (quoting State v. Hudlow, 99 Wash.2d 1, 15, 659 P.2d 514 (1983))). And the Court of Appeals was correct when it noted "the only issue is whether Dr. Rose's testimony was material and relevant to the question of whether `a mental disorder ... impaired the defendant's ability to form the specific intent to commit the crime charged.'" State v. Atsbeha, 96 Wash. App. 654, 660, 981 P.2d 883 (1999) (quoting State v. Ellis, 136 Wash.2d 498, 521, 963 P.2d 843 (1998)). Thus pursuant to Ellis the only remaining inquiry is whether Dr. Rose's testimony was admissible under ER 702, 401, and 402. If it was, it was reversible error to exclude it.
ER 702 provides "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The trial court here determined Dr. Rose, based upon her training, experience, and contact with the defendant, was qualified to testify as an expert. Report of Proceedings (RP) at 44. Nor did the state challenge her qualifications as an expert. Therefore Dr. Rose should have been permitted to testify, in the form of opinion or otherwise, so long as her testimony was relevant. State v. Greene, 139 Wash.2d 64, 73, 984 P.2d 1024 (1999); Ellis, 136 Wash.2d at 523, 963 P.2d 843.
The majority's factual recitation highlights nearly every instance in which Dr. Rose made some statement seemingly damaging to the defendant's theory. But conspicuously absent from the majority opinion is Dr. Rose's response to a query posed by defense counsel which incorporated all of the legal niceties associated with the definition of intent. When asked directly whether Mr. Atsbeha had a diminished ability to form the intent as described in Jury Instruction 6, Dr. Rose replied in the affirmative:
Q. Okay. The particular instructions [sic] that we are addressing here is, "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime." Based on your treatment of Mr. Atsbeha and your knowledge of his physical and mental state in March of 1996, can you state with a reasonable degree of medical certainty that his ability to form this intent *637 was impaired, was diminished in March of 1996?
A. Yes, I believe it was.
2 RP (Feb. 18, 1998) at 28-29.
"All relevant evidence is admissible...." ER 402. "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable...." ER 401 (emphasis added). Mr. Atsbeha's ability, or lack thereof, to form the requisite criminal intent is obviously a matter of consequence to the determination of the action. See State v. Gough, 53 Wash.App. 619, 622, 768 P.2d 1028 (1989) ("Diminished capacity arises out of a mental disorder ... that is demonstrated to have a specific effect on one's capacity to achieve the level of culpability required for a given crime.").
Dr. Rose had been the defendant's physician since 1986. 1 RP (Feb. 17, 1998) at 3. She had intimate knowledge of his brain damage and his "profound" impairment. 1 RP (Feb. 17, 1998) at 48. She testified to his organic brain damage resulting from syphilitic encephalopathy. 1 RP (Feb. 17, 1998) at 10-11. While under her care he was impaired to the point he could not care for himself or engage in simple life-sustaining behavior such as feeding himself or seeking medical attention when necessary. 1 RP (Feb. 17, 1998) at 23. Further, Dr. Rose responded in the affirmative when queried: "[D]o you have a reasonable medical certainty that Mr. Atsbeha's capacity to form the intent to deliver cocaine to another person would have been significantly adversely affected by his medical condition?" 1 RP (Feb. 17, 1998) at 46-47.
Dr. Rose's testimony supported the defendant's theory if believed. 1 RP (Feb. 17, 1998) at 47; 2 RP (Feb. 18, 1998) at 28-29. "This court has long recognized that it is the function and province of the jury to weigh the evidence and determine the credibility of the witnesses and decide disputed questions of fact." State v. Dietrich, 75 Wash.2d 676, 677-78, 453 P.2d 654 (1969).
"To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the specific intent to commit the crime charged." Ellis, 136 Wash.2d at 521, 963 P.2d 843. The proffered testimony here was the defendant's mental condition impaired his ability to form the criminal intent to commit the crime. The trial judge erred as a matter of law when she found the testimony of Dr. Rose irrelevant.
In State v. Hudlow, 99 Wash.2d 1, 16, 659 P.2d 514 (1983) we held "the `compelling state interest' requirement is the proper method of balancing the defendant's right to produce relevant evidence versus the state's interest in limiting the prejudicial effects of that evidence." Thus minimally relevant evidence may be excluded in the face of a compelling state interest; but where the evidence has high probative value "no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22." Hudlow, 99 Wash.2d at 16, 659 P.2d 514 (citing Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); People v. Redmon, 112 Mich.App. 246, 255, 315 N.W.2d 909, 914 (1982)).
Dr. Rose's testimony went to the very heart of Atsbeha's defense: whether he had diminished capacity to form the requisite intent to commit the crime with which he was charged. To exclude such evidence is an abuse of discretion under Hudlow.
The majority also contends the Court of Appeals erred when it concluded Mr. Atsbeha's belief that he was acting as an agent for the police negated the intent element of the crime with which he is charged. Majority at 634-635. Both the majority and the Court of Appeals correctly note expert testimony regarding a defendant's mental state may no longer be admitted or excluded based upon the common law distinctions of intent, those distinctions being replaced by RCW 9A.08.010. Majority at 634; Atsbeha, 96 Wash.App. at 660-61, 981 P.2d 883. However RCW 9A.08.010 enumerates four degrees of criminal culpability: intent, knowledge, recklessness, and criminal negligence. A defendant *638 acts with intent "when he acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a).
When a criminal defendant attacks the intent element he must show he did not act with the objective or purpose to accomplish a result which constitutes a crime. If Mr. Atsbeha believed he was an agent of the police at the time of delivery, he did not act with the objective or purpose to accomplish a result which constitutes a crime. Rather he acted with the objective or purpose to accomplish a result which is specifically NOT a crime. Further, Dr. Rose's testimony regarding the defendant's profoundly impaired perception of reality would clearly have aided the trier of fact to determine whether Atsbeha's capacity to understand his role in these events was diminished. The Court of Appeals was clearly correct in its finding that Mr. Atsbeha's belief that he was an agent of the police negated the intent element of the crime.
Nor do I agree with the majority's assertion that any belief by Mr. Atsbeha concerning his relationship with the police would be relevant and admissible to an insanity defense but not to a diminished capacity defense. Majority at 635.
This claim is problematic for two reasons. First, as previously discussed, when directly asked if Mr. Atsbeha's ability to form the requisite intent was diminished by his mental condition Dr. Rose responded in the affirmative. Second, while diminished capacity is not a lesser included form of insanity, the two are not necessarily mutually exclusive either. In Gough Division One noted: "[D]iminished capacity does not ipso facto follow from insanity." Gough, 53 Wash.App. at 622, 768 P.2d 1028. However, "[i]t is apparent that a mental disorder may amount to insanity and also have a specific effect on the afflicted's capacity to achieve a culpable mental state." Id. (emphasis added).
The same evidence which is admitted to support an insanity defense may also be admitted to establish diminished capacity if the mental disorder also affected "the afflicted's capacity to achieve a culpable mental state." Id. Even if the trial judge was entirely correct that the testimony tended to establish insanity, such conclusion does not necessarily exclude the possibility that the testimony may demonstrate diminished capacity as well. In light of Dr. Rose's testimony, resolution of the matter was for the jury, and Atsbeha's right to trial by jury was abridged when the court took that question from the jury. And this was equally an obvious denial of this man's right to defend against a serious criminal charge when his right to present witnesses on his own behalf was abrogated.
I therefore dissent, and would affirm the Court of Appeals for the reasons set forth.
ALEXANDER, C.J., and JOHNSON, J., concur.
NOTES
[1] State v. Atsbeha, 96 Wash.App. 654, 662, 981 P.2d 883 (1999).
[2] Clerk's Papers at 17-18.
[3] Id. RCW 69.50.401(a)(1)(i) provides:

"Prohibited acts: APenalties. (a) Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.
"(1) Any person who violates this subsection with respect to:
"(i) a controlled substance classified in Schedule I or II which is a narcotic drug or flunitrazepam classified in Schedule IV, is guilty of a crime and upon conviction may be imprisoned for not more than ten years, or (A) fined not more than twenty-five thousand dollars if the crime involved less than two kilograms of the drug, or both such imprisonment or fine; or (B) if the crime involved two or more kilograms of the drug, then fined not more than one hundred thousand dollars for the first two kilograms and not more than fifty dollars for each gram in excess of two kilograms, or both such imprisonment and fine."
RCW 69.50.435(a)(3) provides: "Violations committed in or on certain public places or facilitiesAdditional penalty DefensesConstructionDefinitions. (a) Any person who violates RCW 69.50.401(a) by manufacturing, selling, delivering, or possessing with the intent to manufacture, sell, or deliver a controlled substance listed under that subsection ... to a person:
"....
"(3) Within one thousand feet of a school bus route stop designated by the school district;
"....
"may be punished by a fine of up to twice the fine otherwise authorized by this chapter, but not including twice the fine authorized by RCW 69.50.406, or by imprisonment of up to twice the imprisonment otherwise authorized by this chapter, but not including twice the imprisonment authorized by RCW 69.50.406, or by both such fine and imprisonment. The provisions of this section shall not operate to more than double the fine or imprisonment otherwise authorized by this chapter for an offense."
[4] Clerk's Papers at 2.
[5] Report of Proceedings at 61, 65 (Feb. 17, 1998).
[6] Report of Proceedings at 2-4, 6, 10-11 (Feb. 17, 1998).
[7] Id. at 11-13, 19-21, 23 (Feb. 18, 1998) (emphasis added).
[8] Report of Proceedings at 44 (Feb. 17, 1998).
[9] Id. at 40-42 (Feb. 18, 1998).
[10] Clerk's Papers at 145-46.
[11] Id. at 152-58.
[12] State v. Atsbeha, 96 Wash.App. at 655, 981 P.2d 883.
[13] Id. at 661-62, 981 P.2d 883.
[14] State v. Atsbeha, 140 Wash.2d 1001, 999 P.2d 1262 (2000). On July 3, 2000, Petitioner filed in this Court a "Motion to Strike Legal Theory Argued for First Time in Supplemental Brief of Respondent Atsbeha." The motion provides in part: "[On appeal to this Court] Atsbeha bases his claim of trial court error upon a new legal theory that was not argued to either the trial court or the Court of Appeals." The new legal theory is that "expert testimony was relevant to the defendant's claim that he only intended to possess the cocaine for personal use..." The Supreme Court Clerk considered the motion a "response to Respondent's supplemental brief... [to] be considered at the same time as the merits of the case." Letter of July 3, 2000 to Counsel from C.J. Merritt, Supreme Court Clerk. Respondent did not file a response to Petitioner's motion. We need not address it because it is not material to the question presented in this case.
[15] State v. Ellis, 136 Wash.2d 498, 504, 963 P.2d 843 (1998).
[16] Id. (quoting State v. Castellanos, 132 Wash.2d 94, 97, 935 P.2d 1353 (1997)).
[17] See Supplemental Br. of Pet'r at 15-20.
[18] State v. Ellis, 136 Wash.2d at 521, 963 P.2d 843 (referring to "specific intent" and not culpable mental states). Use of the term "specific intent" is not preferable. "When the Legislature adopted the new criminal code, it replaced the [common-law] concept of general and specific intent with four levels of culpability: intent, knowledge, recklessness, and negligence." State v. Coates, 107 Wash.2d 882, 892, 735 P.2d 64 (1987) (citing RCW 9A.08.010 and State v. Allen, 101 Wash.2d 355, 359, 678 P.2d 798 (1984)).
[19] State v. Ellis, 136 Wash.2d at 500, 963 P.2d 843.
[20] Id. at 500 n. 1, 963 P.2d 843 (quoting RCW 9A.32.030(1)(a)).
[21] Id. at 502, 963 P.2d 843.
[22] Id. at 520, 963 P.2d 843.
[23] Id. at 520-21, 963 P.2d 843.
[24] Id. at 521, 963 P.2d 843.
[25] Id. at 520, 963 P.2d 843.
[26] Id.
[27] Id. at 502, 963 P.2d 843.
[28] 28 Wash.App. 98, 621 P.2d 1310, review denied, 95 Wash.2d 1019 (1981).
[29] State v. Ellis, 136 Wash.2d at 503, 521, 963 P.2d 843.
[30] Id. at 521-22, 963 P.2d 843.
[31] Id. at 521, 523, 963 P.2d 843.
[32] See State v. Greene, 139 Wash.2d 64, 74, 984 P.2d 1024 (1999) (a noncapital case involving convictions for indecent liberties and first degree kidnapping).
[33] Digital Equip. Corp. v. Dep't of Revenue, 129 Wash.2d 177, 184, 916 P.2d 933 (1996) (referring to the retroactivity test outlined by the Supreme Court in Chevron Oil v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)).
[34] Rules of Court, 91 Wash.2d 1100, 1117, 1131, 1157 (1978-79).
[35] State v. Ellis, 136 Wash.2d at 522, 963 P.2d 843.
[36] State v. Greene, 139 Wash.2d at 73, 984 P.2d 1024.
[37] Id. at 73-74, 984 P.2d 1024.
[38] Id. at 74, 984 P.2d 1024.
[39] State v. Sims, 119 Wash.2d 138, 141-42, 829 P.2d 1075 (1992).
[40] Report of Proceedings at 23 (Feb. 18, 1998).
[41] Id. at 20.
[42] State v. Atsbeha, 96 Wash.App. at 660-61, 981 P.2d 883.
[43] Id.
[44] Id. at 661, 981 P.2d 883.
[45] Id.
[46] State v. Nelson, 17 Wash.App. 66, 72, 561 P.2d 1093, review denied, 89 Wash.2d 1001 (1977).
[47] State v. Atsbeha, 96 Wash.App. at 661, 981 P.2d 883.
[48] RCW 9A.12.010 provides: "Insanity. To establish the defense of insanity, it must be shown that:

"(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
"(a) He was unable to perceive the nature and quality of the act with which he is charged; or
"(b) He was unable to tell right from wrong with reference to the particular act charged.
"(2) The defense of insanity must be established by a preponderance of the evidence."