

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 34783-4-III |
| WILLIAM LEE FULTZ, | ) | |
| | ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |

SIDDOWAY, J. — Through retained counsel, William Fultz seeks relief from personal restraint resulting from his 2013 convictions of first degree burglary and first degree robbery. He contends he received ineffective assistance of counsel because his trial lawyer allegedly never investigated his history of mental health issues and failed to advance a theory of diminished capacity at the time of trial. Because he fails to support his petition with necessary evidence, we dismiss it.

BACKGROUND OF 2013 CONVICTIONS[1]

In April 2013, Tamara Knight was living in Deer Park with her son Nicholas and three others. At around 11:00 p.m. on April 4, a woman named Donna arrived at the

---

[1] Most of the following facts can be found in this court's opinion in Mr. Fultz's direct appeal, *State v. Fultz*, No. 31936-9-III (Wash. Ct. App. Mar. 10, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/319369.unp.pdf. We refer to the opinion hereafter as "*Fultz*, Slip. Op." Other facts are based on the record in that proceeding and this one.

home with two men: Jason Koch, described by Ms. Knight as a mutual friend of hers and

Donna's, and William Fultz, who she did not know. Donna was angry because she had

given Ms. Knight a $140 down payment on a Ford Bronco with a failing battery that Ms.

Knight was selling, and when Donna did not come up with the $360 balance on time, Ms.

Knight sold the car to someone else. According to Ms. Knight, she agreed to return the

down payment and was in the process of doing so when Donna grabbed the money,

ripping it in half. Ms. Knight asked Donna to leave. As she left, Donna told Mr. Fultz to

"take care of it." *Fultz*, Slip Op. at 2.

Several hours later, around 3:00 a.m., Mr. Koch and Mr. Fultz were driven back to

the Knight home by a third man, Robert Moody who, when asked his occupation at Mr.

Fultz's trial, said, "I sold dope and collected money." 1 Report of Proceedings (No.

31936-9-III) (RP) (Aug. 27, 2013) at 150. Mr. Moody admitted to jurors at Mr. Fultz's

trial that on the early morning of April 5, he was at Ms. Knight's house to collect

Donna's money. Armed with a baseball bat and accompanied by Mr. Koch and Mr.

Fultz, Mr. Moody knocked on the door to Ms. Knight's house. He then entered

uninvited. He confronted those in the house about Ms. Knight's debt. According to Ms.

Knight, Mr. Koch pulled her outside the house as Mr. Moody was entering. At the same

time, her son Nicholas came out the front door and attacked Mr. Fultz. While wrestling

with Mr. Fultz, Nicholas was hit from behind. Ms. Knight attempted to get Mr. Fultz off

her son and ripped his shirt while doing so. Meanwhile, Mr. Moody hit two people inside

the home with his bat, grabbed a PlayStation, and ran. Mr. Moody, Mr. Koch and Mr. Fultz left the scene in a white sport utility vehicle (SUV) driven by Mr. Moody.

A state trooper saw the SUV headed south toward Spokane shortly after hearing a report of the disturbance and a description of the vehicle. He radioed for backup and pulled the SUV over. When questioned, Mr. Fultz admitted to an investigating officer that he had gone to the Knight home with the others. He told the officer he went there with Mr. Koch "to get his battery back" and was assaulted. 1 RP (Aug. 27, 2013) at 130. Hearsay evidence in support of the personal restraint petition (PRP) suggests that Mr. Fultz had loaned a working car battery to Donna to check out the Ford Bronco, and it was still in the car when Ms. Knight sold it to someone else.

The stolen PlayStation and two baseball bats were found in the SUV stopped by the trooper. Mr. Moody, Mr. Koch, and Mr. Fultz were all placed under arrest that night. Mr. Fultz was charged as an accomplice with first degree burglary, first degree robbery, and two counts of second degree assault with the baseball bat.

Evidence submitted in support of Mr. Fultz's PRP shows that after learning of the arrest, Mr. Fultz's father contacted the lawyer who had been appointed to represent him. The father is a retired naval officer who the lawyer addressed as "Commander" Fultz. We will refer to him that way as well, to make clear whether we are referring to the father or the son. Cdr. Fultz expressed surprise at the seriousness of the charges against his son, stating, "Bill is normally the victim not the perpetrator." Decl. of William E. Fultz,

3

Ex. A at 3. He told his son's lawyer, "I am not sure if you are aware Bill is mentally disabled and when you have time I can provide you with more details." *Id.* The lawyer responded, "The issue of mental health is one of the issues I will want to inquire about" and copied the e-mail to the paralegal for counsel for defense, stating that he wanted to "keep him in the loop." *Id.* at 2.

The State offered plea deals to all three defendants. Mr. Moody and Mr. Koch accepted the State's offers. Mr. Moody testified at Mr. Fultz's trial that he had agreed to a sentence of 48 months in prison and 18 months' supervision by the Department of Corrections. At Mr. Fultz's sentencing, the prosecutor told the court that Mr. Moody and Mr. Koch both pleaded guilty and "are doing four and five years for what they did." 1 RP (Sept. 11, 2013) at 274.

The evidence submitted in support of Mr. Fultz's PRP reveals he was offered a sentence of 31 months. In an e-mail to Cdr. Fultz when the offer was pending, his son's lawyer had the following to say:

> According to the public record of the case (which I can share without permission) your son is charged with 4 counts. . . . [A]ll four counts carry a weapon enhancement because one of the codefendants was armed with a bat. In Washington if one defendant has a weapon then all defendants are treated as if they were armed. All four counts are considered to be "strike" offenses.
> If convicted of all counts William is facing an extremely long sentence and the enhancements add additional time that is not subject to a good time reduction and enhancements run consecutively to one another.

4

> Please be aware that I am not saying the offer of 31 months is an ideal solution. The deputy prosecutor have had [sic] communications on that issue but the offer he has made is what it is.
> If William rejects the offer I will do my best at trial with the facts of the case and with William's assistance.

Decl. of William E. Fultz, Ex. A at 1. Mr. Fultz did not accept the offer.

At trial, Mr. Fultz's lawyer focused his defense on the evidence that his client did not enter the Knight home, did not personally commit the two assaults, and did not personally take the PlayStation. Mr. Fultz did not testify. The State's theory was, of course, that Mr. Fultz was liable as an accomplice, but Mr. Fultz's lawyer emphasized the statement in the court's instructions that "more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice." 1 RP (Aug. 28, 2013) at 239-40. He persuaded the court to instruct the jury on self-defense to the charges of assault and on a person's right to act on appearances in defending himself. The jury nonetheless found Mr. Fultz guilty on all counts and found that he was armed with a deadly weapon at the time he committed each crime.

Although Mr. Fultz's only criminal history consisted of two misdemeanors committed in 1998 and 1999, the total sentencing range, given the seriousness of the

5

charges and deadly weapon enhancements for the two counts that did not merge,[2] was 89-102 months. The trial court sentenced him to the low end of the standard range.

Mr. Fultz appealed, arguing the evidence was insufficient to prove he was an accomplice to the burglary and robbery and did not act in self-defense. This court found the evidence sufficient and affirmed in an unpublished decision filed on March 10, 2015. A petition for review by the Washington Supreme Court was denied and the mandate from this court issued on October 13, 2015. This PRP was filed a little under a year later, making it timely under RCW 10.73.090(1).

PERSONAL RESTRAINT PETITION

Mr. Fultz's PRP asserts he was deprived of his constitutional right to effective representation of counsel when his lawyer, knowing that Mr. Fultz suffered from "severe mental illness" and "on notice of a diminished capacity defense that he acknowledged needed to be explored," nonetheless "neither investigated [the defense] nor pursued nor raised [it] at trial." Br. in Support of PRP at 10. Mr. Fultz seeks remand for a new trial.

As evidence in support of his PRP, Mr. Fultz submits the declaration from his father, e-mail communications taking place between his father and his lawyer during the spring and summer of 2013, and three reports addressing Mr. Fultz's mental health problems that range in date from July 1997 to October 2000.

---

[2] It was conceded by the State and found by the court that the second degree assaults merged with the robbery conviction.

The declaration of Cdr. Fultz evokes sympathy. It establishes that Mr. Fultz had a severe seizure at age 13 months, was unconscious for 3 days, and woke up having lost the ability to walk and talk. The inability to talk persisted through age 3, and Mr. Fultz was referred for special education that continued until he was age 15. He was then in a mental hospital for residential treatment until he was age 18. The treatment center assisted him in applying for Supplemental Security Income (SSI), which Mr. Fultz has lived on ever since.

Cdr. Fultz states in his declaration that "[t]hroughout Bill's history, he has been known to be friendly and helpful, but does not understand that not everyone is." Decl. of William E. Fultz at 2. He provides examples of Mr. Fultz being taken advantage of by others. Yet his own declaration and communications with his son's lawyer establish that Mr. Fultz was living independently and had been living independently for some time. Given Mr. Fultz's February 1979 birth date, he was 34 years old at the time he committed the crimes for which he is presently serving time.

Cdr. Fultz attaches two mental health assessments to his declaration. The first, a short report by clinical psychologist Karen Zappone, Ph.D., was prepared when Mr. Fultz was 21 years old and is dated 9/27/00. Its content suggests it was prepared to support Mr. Fultz's successful application for SSI. Dr. Zappone explains that Mr. Fultz was referred to her upon his release from the Devereux Treatment Center in Texas in August 1997 with a diagnosis of Intermittent Explosive Disorder and Borderline Personality Disorder,

7

and a rule out (R/O) of Post-Traumatic Stress Disorder. Dr. Zappone made further diagnoses of Depression NOS, Cognitive Disorder NOS, and ADHD Combined Type. She reports that during the period of her treatment,

> mood swings have prevented [Bill] from working on a consistent basis. Attempts at job training and sheltered work have failed. He wants to do well. However, personality factors, environmental factors and mood swings get in the way.

Decl. of William E. Fultz, Ex. B at 1. She considered Mr. Fultz 100 percent disabled, with a poor prognosis and no expectation he would recover.

A third, even shorter report is from Captain R. Nicoll Pratt, a staff psychiatrist in the Child and Adolescent Division of the Naval Medical Center in San Diego, where Cdr. Fultz had been stationed. It is dated October 5, 2000, shortly after Dr. Zappone's report, suggesting that it, too, was provided to support Mr. Fultz's application for SSI. Capt. Pratt reports:

> Mr. Fultz was my patient from age 12 to 17. He suffered from severe emotional and behavioral problems that have persisted into adulthood characterized by ADHD, marked immature reaction to stress, severe learning disabilities, very maladaptive judgement [sic], and lack of control of anger. He has been unable to hold a job, has a child out of wedlock, and a history of 5 incarceration[s] all related to poor interpersonal judgment. [H]e has been in residential treatment on 4 separate occasions. He is permanently emotionally disabled.

*Id.* at 3.

A third, earlier, report is not authenticated but is attached to the brief in support of the PRP. It appears to be a portion of a progress report completed on Mr. Fultz's

8

discharge from the Devereux Treatment Center in Texas and is dated July and August

1997. It reflects the center's diagnoses reported in Dr. Zappone's later report. Among

other discussion of Mr. Fultz's problems and progress, it identifies the following eight

major presenting problems at the time of Mr. Fultz's admission:

1. Aggressive/assaultive behavior
2. Property destruction
3. Oppositional/Defiant Behavior
4. AWOL behavior
5. Academic difficulties
6. Family conflict
7. History of seizure disorder
8. History of anti-social behavior including lying and stealing

Br. in Support of PRP, Ex. 1 at 1. Its prognosis for Mr. Fultz is "guarded." *Id.* at 3.

## PRP Review Standard

To obtain relief in a PRP, a petitioner must show actual and substantial prejudice

resulting from alleged constitutional errors, or for alleged nonconstitutional errors a

fundamental defect that inherently results in a complete miscarriage of justice. *In re*

*Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Where a PRP alleges

and successfully demonstrates ineffective assistance of counsel, the actual and substantial

prejudice required for relief on collateral review has been shown. *In re Pers. Restraint of*

*Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Effective assistance of counsel is guaranteed by both the federal and state

constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v.*

*Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995).  To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)).  When a claim can be disposed of on one ground, this court need not consider both.  *Strickland*, 466 U.S. at 697.

To avoid dismissal, the petition must be supported by facts and not merely bald or conclusory allegations.  *Cook*, 114 Wn.2d at 813-14; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

Analysis

The disposition of Mr. Fultz's PRP turns on his failure to support his contentions of deficient performance and prejudice with more than bald or conclusory allegations.

A criminal defendant is entitled to have the jury instructed on diminished capacity only if the defendant satisfies three requirements: (1) the crime charged must include a particular mental state as an element, (2) the defendant must present evidence of a mental disorder, and (3) expert testimony must logically and reasonably connect the defendant's

10

alleged mental condition with the asserted inability to form the mental state required for the crime charged. *State v. Atsbeha*, 142 Wn.2d 904, 914, 921, 16 P.3d 626 (2001); *State v. Eakins*, 127 Wn.2d 490, 502, 902 P.2d 1236 (1995).

As to the first requirement—that a particular mental status is an element— accomplice liability includes such an element, but it is merely knowledge. RCW 9A.08.020(3)(a)(i)-(ii) (an accomplice is one who, "[w]ith knowledge that it will promote or facilitate the commission of the crime . . . encourages . . . or . . . aids" another). The instruction to which Mr. Fultz claims he was entitled would have informed the jury that it could take into consideration whether, given a demonstrated mental disorder, he had the capacity for such knowledge.[3] An "accomplice must have acted with knowledge that his or her conduct would promote or facilitate the crime for which he or she is eventually charged," *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000) (emphasis omitted), but he or she need have only general knowledge of the substantive crime, not specific knowledge of the crime's elements. *State v. Truong*, 168 Wn. App. 529, 540, 277 P.3d 74 (2012) (citing *State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d 199 (1984)).

---

[3] The pattern jury instruction on diminished capacity states:

Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form (fill in requisite mental state).

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.20, at 302 (4th ed. 2016).

As to the second and third requirements for a diminished capacity defense, "It is not enough that a defendant may be diagnosed as suffering from a particular mental disorder. The diagnosis must . . . be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime." *Atsbeha*, 142 Wn.2d at 921.

Mr. Fultz contends his lawyer never investigated his mental history and limitations, but we do not have a declaration from Mr. Fultz or his trial lawyer that the two of them never discussed those issues. Clearly there was a downside to asserting a defense that would open the door to evidence of Mr. Fultz's prior convictions and his treating providers' observations of his problems with anger and aggression. We cannot rely on Cdr. Fultz's declaration as demonstrating everything his son's lawyer did or did not do; by Cdr. Fultz's own admission, he and his son were not in regular communication.[4] We have no evidence that the trial lawyer was asked to provide information for purposes of this PRP but refused to cooperate. We have only Mr. Fultz's bald assertion through his present counsel that his trial lawyer did nothing.

---

[4] In a June 2013 e-mail, Cdr. Fultz told his son's trial lawyer:

> Last year I tried to get Bill to stay at a [c]ondo I had for him in San Diego where we have family for support but he decided he wanted to go to Spokane. I gave [B]ill some money to settle in and said if you get on the plane I am done. Bill took me by my word and had very little contact with me[;] most of my information comes from our daughter.

Decl. of William E. Fultz, Ex. A at 2.

12

Mr. Fultz also contends that he "suffered from severe psychological and mental health issues[,] negating his ability to form the intent element required in all the crimes for which he was convicted," Br. in Support of PRP at 1, but he presents no competent supporting evidence. Where, as here, there was no expert testimony at trial on a defendant's mental disorder or condition at the time of the crimes, it is incumbent upon a petitioner to "demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." *Rice*, 118 Wn.2d at 886.

> If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits, in turn, must contain matters to which the affiants may competently testify. In short, the petitioner must present evidence showing that his factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.

*Id.*

As the State correctly observes, Mr. Fultz has provided only evidence of his mental condition 13 or more years before the relevant time frame. Arguably even more unhelpful is the fact that none of the reports touches on whether the mental disorders diagnosed would render Mr. Fultz incapable of the relevant mental state. Reviewing the reports as laypersons, it does not appear to us that any of the diagnosed disorders would necessarily impair Mr. Fultz's capacity for knowing that his presence as backup to a debt collector at 3:00 a.m. could promote or facilitate the collector's commission of a late night home invasion and robbery.

13

To meet the threshold showing required by *Rice*, Mr. Fultz needed the support of an expert that he had a viable diminished capacity defense. Because he has failed to make the threshold showing, the petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.