IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82455-4-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| ANYA MONTGOMERY, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, A.C.J. — Anya Montgomery was convicted of attempted murder in the first degree and sentenced to 240 months in confinement. Montgomery appeals, contending that the trial court erred in permitting the State to exercise peremptory challenges on two jurors who identify as being from BIPOC[1] communities. Additionally, Montgomery contends that the prosecutor committed prosecutorial misconduct by misstating the law in his closing argument. Because the State's peremptory strikes on Jurors 39 and 4 did not violate GR 37 and there was no prosecutorial misconduct, we affirm the decisions of the trial court.

## FACTS

Anya Montgomery was adopted by Charles and Anne Meis when she was about four and a half years old. In 1997, a therapist diagnosed Montgomery with reactive attachment disorder and post-traumatic stress-disorder. Montgomery stayed with the Meises until they relinquished their parental rights in 2005, when

---

[1] "BIPOC" stands for Black, Indigenous, and people of color.

Citations and pin cites are based on the Westlaw online version of the cited material.

Montgomery was 12 years old. In July 2016, Montgomery told her therapist that she wanted to kill her former parents. The therapist reported this to law enforcement and Montgomery was sent to a hospital for civil commitment.

Soon after, on August 22, 2016, Montgomery waited outside the Meis house and as soon as Charles Meis exited his home, Montgomery charged toward Charles with a knife. Montgomery scratched Charles's stomach through his shirt. Charles grabbed a plastic watering jug and hit Montgomery with it repeatedly to subdue her. Anne Meis eventually came outside of the house and she used pepper spray against Montgomery. After 14 minutes, the police arrived and arrested Montgomery.

While being interrogated by police, Montgomery stated that she had been physically and sexually abused by the Meises when she lived with them and that she had come back to kill them. Montgomery also told them that she had been trying to commit "suicide by cop."

Montgomery was charged with two counts of attempted murder in the first degree and felony harassment. The case proceeded to a jury trial. Before voir dire, the court announced its intention

> to keep track of people's minority status, you know, if they're indicating to us that they're LGBTQA or plus or that they're of Latino/Latina origin or that they are black or whatever. Okay? I keep track of that myself in my own notes, and I share those observations with you when the jurors aren't around. I've always done this.
>
> And I just keep an eye on the peremptories to make sure that I can see a basis for a peremptory that's exercised that does not have to do with minority status.

2

Juror 39 identified as Asian and they were concerned about participating in jury duty because of their job duties as a systems administrator. During voir dire, Juror 39 shared that their cousin "had, like, schizophrenia. So, basically, many times he'd always have to be put into the mental institute."

When the prosecutor asked the jurors how they felt about being a juror in a case where they would be dealing with the intersection of mental health and criminal law, Juror 39 shared that the same cousin had had an altercation with police, stating "I think five, six years ago, he got in a scuffle with the police, and they – I think he tried to grab their mace or something. And then they basically punched his eyes out, and he had to have eye surgery."

The prosecutor asked Juror 39 if they thought that their cousin was treated fairly by the civil and criminal legal systems and Juror 39 said:

> I'm not sure. It's just, I guess, how I feel the situation is, even to this day, it's kind of hard to see, like when you're—a person you're so close to—you know, his eyes and face is all bruised. And it's such a terrible situation that—I mean, it's so hard for me to say I could be unbiased in that situation, but I can't really say—yeah, so I'm sorry.

The State exercised its fourth peremptory challenge on Juror 39. The court raised that the juror was "Asian. But that—also identified as really not wanting to be here because of their systems administration." The court then asked the State, "What's your other concern, if any, about that juror?" The State answered that "that juror had the experience with her cousin who had the mental illness who had . . . been involved in an altercation with the police and . . . involuntary

3

commitment issues." To which the court responded, "So, again, I see a basis to excuse that is not based on her identification as Asian."

Juror 4 identified as Indian American. During voir dire, Juror 4 mentioned that she had just turned 18, that she didn't have a lot of experience, and that she wasn't sure if she was ready to figure out whether the State had proved its case beyond a reasonable doubt. The court asked the jurors if they understood that they would not be informed of the consequences resulting from the jury decision and to share their thoughts. Juror 4 shared that:

> Like, if it's due to a mental illness, there's going to be negative consequences on both sides, despite, like what we rule. And, like, I just don't know if I feel comfortable, like, if we say—like, that Ms. Montgomery's guilty then, like there's going to be negative consequences on her side; and if we say she's not guilty, there could be negative consequences on the other side, and we could end up hurting people, despite—and that's just what I'm really concerned about for myself. And I just don't want that burden on me.

The State exercised its fifth peremptory challenge on Juror 4. The court responded:

> Yeah. And I will say right now that Juror No. 4 indicated a huge amount of trouble even making a decision in this case. I thought it was [even-steven] as to which of you might challenge this juror, but it has nothing to do with her background as Indian American, by which I mean she appears to be of descent from India, from what she told us.
>
> All right. So that was the state's fifth, and brings in Juror No. 59.

There no were no further comments by the State or Montgomery about Juror 4.

At trial, Montgomery presented a diminished capacity defense. She presented testimony from Dr. Mark Cunningham that Montgomery did not intend to kill the Meises, but was instead acting out a "victim-to-superhero role play."

4

On cross examination, Dr. Cunningham acknowledged that Montgomery told police that she had tried to kill the Meises and that she knew killing them was wrong. The prosecutor and Dr. Cunningham later had this exchange:

> Q: . . . I mean, she understood that what she was going over there to do was considered to be illegal, but your opinion is that she didn't intend to actually assault or attempt to kill anybody. Correct?
>
> . . . .
>
> A: That's correct. There are two different psycho legal [sic] issues. I'm not saying she was not guilty by reason of insanity. I'm saying she lacked capacity to form intent. Those are two different issues with different standards.
>
> Q: All right. That's not what I asked, and now that you've brought up the issue of insanity, you are not opining that she was insane at the time legally. Correct?
>
> A: That's correct.
>
> Q: Okay. But the point being, again, that her awareness that her—what she was doing was illegal is not consistent with not intending to do anything illegal; i.e., kill the Meises. Correct?
>
> A: That's not correct.

In his closing argument, the prosecutor contended that Dr. Cunningham's opinion was inconsistent because Dr. Cunningham stated that Montgomery "appreciated that what she was doing was wrong while at the same time trying to tell you that she could not form the intent to do that wrong thing, which was to kill Charles and Anne Meis. That opinion is not consistent within itself." He noted that the Dr. Cunningham had opined that an insanity defense did not apply, which was why there was no jury instruction discussing the insanity defense. He then stated:

> We were having that discussion, and he was again talking about appreciating that wrongfulness of the conduct and, again, his

opinion was she—she did.  That's why an insanity defense, in his opinion, didn't apply.  But the fact that she could appreciate, again, killing somebody was wrong, which was why, and he based that on the fact that she was concealing from [her] adopted sister what she was going to be doing that night, again, is inconsistent with her failing to have the capacity to form the intent to kill the Meises.

The jury found Montgomery guilty on two counts of attempted murder in the first degree.  Montgomery was sentenced to 240 months of confinement.

Montgomery appealed.

ANALYSIS

Peremptory Challenges

Montgomery contends that the trial court erred in permitting the State to exercise peremptory challenges on two jurors who identify as being from BIPOC communities.  The State claims that the challenges were valid and non-discriminatory, and it requests that the panel affirm the trial court's decision.  We conclude that the challenge on Juror 39 was not based on race or ethnicity.  Additionally, no GR 37 issue was raised for Juror 4 because there was no objection by either party or the court.

"A peremptory challenge is an objection to a juror for which no reason need be given, but upon which the court shall exclude the juror."  RCW 4.44.140.  "Either party may challenge the jurors.  The challenge shall be to individual jurors, and be peremptory or for cause."  RCW 4.44.130.

"Although a prosecutor ordinarily is entitled to exercise peremptory challenges for any reason . . . the Equal Protection Clause[2] forbids the prosecutor to challenge potential jurors solely on account of their race."  Batson

_____

[2] U.S. CONT. Amend XIV.

6

v. Kentucky, 476 U.S. 79, 79-80, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  The three-part Batson test is used to determine whether a peremptory challenge was racially motivated:

> The defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  The defendant may also rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.  Finally, the defendant must show that such facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen from the petit jury on account of race.

Batson, 476 U.S. at 80.  "The peremptory strike of a juror who is the only member of a cognizable racial group constitutes a prima facie showing of a racial discrimination requiring a full Batson analysis."  Seattle v. Erickson, 188 Wn.2d 721, 724, 398 P.3d 1124 (2017).  After the objecting party makes a prima facie showing of discrimination, the burden shifts to the challenging party to provide a neutral reason for their strike.  Batson, 476 U.S. at 80.

Batson's purposeful discrimination requirement became an issue because the problem is not usually a "conscious desire to discriminate," it is often "negative stereotypes and assumptions" that lead people to discriminatory decision-making.  State v. Lahman, 17 Wn. App. 2d 925, 933, 488 P.3d 881 (2021).  Therefore, in 2018, the Washington Supreme Court adopted GR 37 to address unconscious bias and difficulties in meeting the Batson three-part test.  Id.  GR 37 modifies the third step of Batson.  State v. Orozco, 19 Wn. App. 2d 367, 374, 496 P.3d 1215 (2021).

7

Under GR 37, the court or either party "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). After an objection is made, the challenging party "shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). The court then evaluates the reasons given for the challenge, "in light of the totality of circumstances." GR 37(e). And "if the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e).

When assessing the circumstances, the court considers a number of factors such as, "whether a reason might be disproportionately associated with race or ethnicity and . . . whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases." GR 37(g)(iv)-(v). There are also presumptively invalid reasons that disqualify a peremptory challenge such as "having a close relationship with people who have been stopped, arrested, or convicted of a crime." GR 37(h)(iii).

"We review the third step of Batson and the application of GR 37 de novo." Orozco, 19 Wn. App. 2d at 374. "The remedy for the erroneous exclusion of a juror from service on the basis of race or ethnicity is reversal and remand." Lahman, 17 Wn. App. 2d at 929.

1. Juror 39

Montgomery claims that the challenge on Juror 39 was based on the juror having a close relationship with a person who had been stopped or arrested of a crime, a presumptively invalid reason under GR 37(h)(iii). We conclude that the

State's reason was not presumptively invalid and that an objective observer could not view race or ethnicity as a factor in the use of the challenge against Juror 39.

As an initial matter, the State contends that Montgomery never objected to their strike on Juror 39 and that therefore the burden never shifted to the State to provide a race-neutral reason. We disagree. Under GR 37(c), the parties *or* the court may raise an objection "by simple citation to this rule." Here, after the State struck Juror 39 the court immediately stated that Juror 39 was Asian and then asked the State, "What's your other concern, if any, about that juror?" We conclude that the comment by the court and its subsequent request that the State articulate its reasons were sufficient to constitute an objection under GR 37.

The court is required to view the "proffered justification in light of the totality of the circumstances." Orozco, 19 Wn. App. 2d at 375. This was not an instance where a juror was simply connected to a person that had had some sort of interaction with the police. Juror 39 detailed the fact that their cousin had their eye punched by the police and had to have surgery. Juror 39 also discussed that their cousin battled with schizophrenia and that their cousin had to be put into a mental institute many times. Additionally, Juror 39 clearly communicated that they were not sure that they could be unbiased in deciding this case. The similarities between Montgomery and Juror 39's cousin's mental health coupled with the escalated altercation with the police are reasons to strike the juror that go above and beyond merely "having a close relationship with people who have

9

been stopped [or] arrested." GR 37(h)(iii). Evaluated in light of the totality of the circumstances, an objective observer could not view race or ethnicity as a factor in the use of the peremptory challenge on Juror 39.

Montgomery relies on Orozco to contend that "combining a race-neutral justification with a presumptively invalid one is not 'race neutral.'" 19 Wn. App. 2d at 377. In Orozco, the defense objected to the State's challenge on Juror 25 (the only African American female juror) and the prosecutor reasoned that they had personally prosecuted Juror 25 for minor crimes and that they had seen the juror in police reports associated with people in criminal activity. Id. at 372. Because one of the reasons offered by the State was a presumptively invalid reason (Juror 25's association with people in criminal activity), under GR 37(h)(iii), the challenge on Juror 25 was reversed. Here, the State has not offered a presumptively invalid reason for the challenge on Juror 39.

We conclude that the peremptory challenge on Juror 39 did not violate GR 37.

2. Juror 4

Montgomery contends that the court violated Batson[3] and GR 37 by offering its own non-discriminatory reason for the challenge on Juror 4. As

_____

[3] In their initial briefs, the parties disputed whether the State's use of peremptory challenges on Jurors 4 (the only juror of Indian descent) and 39 (one of the final jurors of Asian descent) established a prima facie case of discrimination. A defendant "may establish a prima facie case of purposeful discrimination" by showing that the challenged juror is the last member of a racially cognizable group. Batson, 476 U.S. at 80. But as Montgomery acknowledged, "under GR 37, there is no longer any requirement of making a prima facie showing of racial discrimination and 'simple citation' to the rule is sufficient to compel an analysis pursuant to its provisions." State v. Listoe, 15

detailed above, GR 37 requires an objection by either party or the court and a simple citation to the rule. GR 37(c). But, because neither of the parties nor the court objected to the challenge, we conclude that the court did not violate GR 37.

After the State exercised its challenge on Juror 4, the court stated that Juror 4 "indicated a huge amount of trouble even making a decision in this case" and in regards to the challenge, "it has nothing to do with her background as Indian American." The State was never asked to articulate its reasons behind the peremptory challenge on Juror 4.

Rather than being an objection to the challenge, the comments by the court were more in line with the court's announced intentions, before voir dire, to track jurors who identify as being from the BIPOC community and to monitor the reasons for peremptory challenges. There was no simple citation to GR 37 by either party or the court. By contrast, after the strike on Juror 39, the court clearly stated the race of the juror and *then* the court asked the State to share its reasoning. The conversational exchange related to Juror 39 is an example of a raised objection under GR 37(c) followed by the call to articulate reasons as required by GR 37(d). Such an objection is not present here, and without an objection, GR 37 is not implicated.

Montgomery contends that by offering a reason for the peremptory challenge, the court was improperly taking on the "role" of the prosecutor, citing State v. Moreno, 147 Wn.2d 500, 509, 58 P.3d 265 (2002). This argument is

_____

Wn. App. 2d 308, 321, 475 P.3d 534 (2020) (quoting GR 37(c)). We therefore need not address the issue.

flawed because the court was not taking on the prosecutor's role of articulating their reason for the challenge, rather it was just explaining why it was not objecting.

We conclude that the peremptory challenge on Juror 4 did not violate GR 37.

Prosecutorial Misconduct

Montgomery contends that the prosecutor committed misconduct in his closing argument by referencing the standard for an insanity defense, which the jury did not receive instructions about, and by misstating the law regarding diminished capacity. We disagree.

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). "The burden to establish prejudice requires the defendant to prove that 'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.' " Thorgerson, 172 Wn.2d at 442-43 (alteration in original) (quoting Magers, 164 Wn.2d at 191). "When reviewing a claim that prosecutorial misconduct requires reversal, the court should review the statements in the context of the entire case." Id. at 443.

"At trial, 'counsel are permitted latitude to argue the facts in evidence and reasonable inferences' in their closing argument." Dhaliwal, 150 Wn.2d at 577 (quoting State v. Smith, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). Prosecutors can use witness testimony to draw inferences in their closing arguments and their statements are proper if they are based on evidence presented at trial. Id. at 579.

"If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict" to require reversal. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Id. at 760-61.

Montgomery first challenges the prosecutor's reference to the insanity defense in his closing argument. "It is the rule in this state that statements by the prosecution or defense to the jury upon the law must be confined to the law as set forth in the instructions of the court." State v. Estill, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972). But the prosecutor's mere reference to the insanity defense was not misconduct, because the defense expert raised the issue and the prosecutor's reference to the insanity defense was simply explaining that it did not apply. See State v. Davenport, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984) (prosecutor violated Estill rule by arguing in closing argument an alternate theory

that defendant was an accomplice, despite the lack of any instructions on accomplices).

Montgomery also contends that the prosecutor misstated the law in closing argument by "arguing it was contradictory to claim an ability to tell right from wrong under the insanity standard while simultaneously claiming diminished capacity."

To establish an insanity defense, "the defendant must prove that at the time of the offense he or she was unable to perceive the nature and quality of the act charged or was unable to tell right from wrong with regard to that act." State v. Box, 109 Wn.2d 320, 322, 745 P.2d 23 (1987). By contrast, to establish a diminished capacity defense, "a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

Montgomery claims that the prosecutor wrongly characterized diminished capacity as being impossible to establish if a defendant could tell right from wrong with regard to the act. She points to the prosecutor's characterization of Dr. Cunningham's testimony as saying that Montgomery "appreciated that what she was doing was wrong while at the same time trying to tell you that she could not form the intent to do that wrong thing, which was to kill Charles and Anne Meis. That opinion is not consistent within itself." But this statement does not imply that a defendant must establish insanity to establish diminished capacity. Instead, the prosecutor argues that Montgomery not only knew murder was

14

wrong but knew specifically that killing the Meises was wrong, and that this implied that she knew what she was doing and intended to kill them. The prosecutor's comments did not misstate the law, but instead drew an inference from the testimony of Dr. Cunningham and the evidence presented at trial.

Moreover, Montgomery cannot show that any misconduct would have a "substantial likelihood of affecting" the verdict. Emery, 174 Wn.2d at 760. Montgomery objected to the prosecutor's characterization of Dr. Cunningham's testimony, and the court noted to the jury that the mental health defense was explained in the jury instructions. It directed them, "[t]o the extent that you find that argument from the attorneys differs from the legal instructions, you follow my instructions." In light of the court's instruction and Montgomery's consistent statements before and after the incident that she intended to kill the Meises, Montgomery cannot show that the prosecutor's characterization of Dr. Cunningham's testimony likely affected the verdict.

We affirm.

_Smith, a.C.J._

WE CONCUR:

_____     _____