# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59502-8-II |
| Respondent, | |
| v. | |
| DAVID ALEXANDER KNOX, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — David A. Knox pleaded guilty to nine crimes, which included two sets of second degree assault and first degree robbery charges (Counts I and II and Counts VII and VIII). On appeal, Knox argues that his second degree assault convictions merge into his first degree robbery convictions, and as it stands, those convictions violate double jeopardy. Knox additionally argues that the trial court abused its discretion during sentencing when it failed to consider the mitigating circumstances of his failed diminished capacity defense in his request for an exceptional downward sentence. Finally, Knox raises several claims in a statement of additional grounds (SAG).[1]

On Counts I (second degree assault) and II (first degree robbery), we hold that Knox's conviction for second degree assault and first degree robbery do not violate double jeopardy because there is no clear legislative intent relating to punishment; the assault and robbery were not the same in law; and merger does not apply. On Counts VII (first degree robbery) and VIII (second degree assault), we hold that Knox's convictions do not violate double jeopardy because the assault

---

[1] RAP 10.10.

and robbery involved different victims. With regard to Knox's challenge to his sentence, because the record shows the trial court appropriately considered Knox's request for an exceptional downward sentence, we hold the trial court did not abuse its discretion. Finally, we hold that Knox's SAG claims fail. Accordingly, we affirm Knox's convictions and sentence.

FACTS

A.    BACKGROUND

1.    The Store Incident

On July 22, 2022, Knox and his girlfriend, K.H., were shopping at a store in Port Orchard. While inside the store, Knox accused K.H. of stealing $50 from him. Knox became agitated and "shoved [K.H.] in the face forcibly enough to cause her to fall over and strike the shelf behind." Clerk's Papers (CP) at 87. Knox then assisted K.H. to her feet as a store employee approached them, and Knox reassured the store employee that everything was fine. K.H. left the store in an attempt to deescalate the situation.

Knox followed K.H. and confronted her outside the store. He shoved K.H. and her shopping cart to the ground, then he walked a "short distance away before returning to shove her to the ground while she was attempting to stand." CP at 87. Knox proceeded to punch and kick K.H.'s face and body repeatedly. Knox again walked away from K.H. to his car and moved his car to park it near K.H.

K.H. attempted to retrieve her belongings from Knox's car, but Knox stepped out of the car and started shoving K.H. away. Another woman[2] attempted to intervene, at which point Knox

---

[2] The record suggests this woman, "Margarita," was known to both Knox and K.H. and had possibly been present with Knox and K.H. while they shopped in the store. CP at 86. However, the woman left the scene and did not speak with law enforcement.

again stepped away from K.H. for approximately one minute. Knox then repositioned his car, and K.H. again attempted to retrieve her belongings from the car. As she did so, Knox "jump[ed] out of the vehicle and [ran], gaining speed before tackling [K.H.] to the ground, where he [began] to pummel her with his hands and feet for approximately two minutes before picking an item off of the ground and fleeing the scene." CP at 87. According to K.H., while Knox was pummeling her, he at one point strangled her and she lost consciousness. K.H. later awoke and found that her purse and phone had been stolen.

K.H. suffered a laceration in her left eyebrow that required stitches. The responding officer also observed significant bruising on K.H.'s "face, neck, chest, arms, and right hand." CP at 86. At one point when K.H. was speaking to the responding officer, she was "unable to speak due to spitting up a mouthful of blood." CP at 86. Several witnesses provided written statements, and the store surveillance footage captured the events.[3] K.H. informed law enforcement that Knox drove a maroon Chevy Impala and provided his license plate number. A warrant was issued for Knox's arrest.

2.      Carjacking

Two days after the incident involving K.H., Bremerton Police Officer Allan McComas saw Knox driving his vehicle "at a high rate of speed." CP at 89. Knox ran through an intersection without stopping and drove onto the shoulder of the road to avoid Officer McComas. Officer McComas identified Knox based on the outstanding arrest warrant and broadcasted over his police radio that he had sighted Knox. Approximately 20 minutes later, another Bremerton police officer saw Knox approaching a highway on-ramp, again at a high rate of speed. The officer activated his

---

[3] The witness statements and surveillance footage were not designated in the record on appeal.

emergency lights and gave chase; however, Knox continued onto the highway, driving erratically. The officer feared Knox would crash into bystanders and discontinued his pursuit.

Shortly thereafter, Bremerton Police Sergeant Jeffrey Schaefer saw Knox on the highway and began to pursue him. Knox exited the highway and crashed his car into a median. Three officers, including Sergeant Schaefer, converged at the scene and attempted to apprehend Knox. However, Knox exited his car armed with a rifle. Knox ran behind his vehicle and out of the officers' sight. The officers heard a gunshot, but neither the officers nor their vehicles were struck. Knox then ran down an embankment back onto the highway.

As Knox ran onto the highway, Officer McComas approached the scene from a highway overpass and saw Knox with a rifle. Knox raised his rifle and shot at Officer McComas. Officer McComas took cover and lost sight of Knox.

Knox then stopped a vehicle on the highway. The vehicle was driven by Andrea Wiren, and her two roommates, William Porterfield and Jordan Carson, were passengers. Knox pointed the "AK 47 type rifle" at Wiren, "struck the hood of her vehicle with the back end of the rifle and told everyone to get out." CP at 90. Wiren, Porterfield, and Carson did not initially exit the car, so Knox raised the rifle just above the car, fired a round, and yelled at them to get out. After that, Wiren, Porterfield, and Carson exited the car.

Knox drove off in Wiren's car. Wiren's cell phone was still in her car when Knox drove away. Wiren's father was able to use a location tracking application to determine the location of Wiren's phone. The tracking application showed that Wiren's phone was located at an address on Harlow Drive in Bremerton. An officer who was dispatched to the address confirmed that Wiren's vehicle was at a residence on Harlow Drive.

4

3.    Subsequent Events

Units from the Poulsbo and Bremerton Police Departments, including a SWAT Team, Kitsap County Sheriff's Office, Washington Fish and Wildlife, and Washington State Patrol arrived at the Harlow Drive residence.  After law enforcement arrived, several individuals, including the homeowner, came out of the residence and confirmed that Knox was inside with a gun.

Officers attempted to communicate with Knox to get him to surrender.  However, Knox began firing at the law enforcement officers outside the house.  Several officers had to take cover to avoid being shot.  Over the course of several hours, Knox fired numerous rounds from the house in the direction of law enforcement.  At least one patrol vehicle was struck by bullets that Knox had fired.  Knox refused to come out of the house and yelled that law enforcement would need to kill him.

Then, the house caught fire.[4]  The fire engulfed the house, but Knox escaped by jumping from a balcony.

Knox jumped into a car on the property and drove away from the scene.  Officers gave chase.  Knox fired at the officers as he drove away.  Knox then turned down a street that had been blocked due to an ongoing construction project and could drive no further.  Knox crashed into the construction fencing and came to a stop.

---

[4]  Law enforcement initially believed that Knox had started the fire, but a subsequent investigation suggested the residents of the Harlow Drive house had been cooking when Knox unexpectedly arrived and items had been left on the stove unattended.

5

Knox and the officers exchanged gunfire. Knox then threw his rifle out the car window and attempted to escape by running into the construction site. Officers pursued and apprehended Knox. Knox stated that he had taken "several Xanax pills" that day. CP at 91.

B.    PROCEDURAL HISTORY

1.    Knox Pleads Guilty

In a second amended information, the State charged Knox with nine counts: (1) second degree assault against K.H. (Count I); (2) first degree robbery against K.H. (Count II); (3) second degree attempted murder (Count III); (4) unlawful possession of a firearm (Count V);[5] (5) attempting to elude (Count VI); (6) first degree robbery against Wiren (Count VII); (7) second degree assault against Porterfield and Carson (Count VIII); (8) second degree attempted murder (Count XI); and (9) first degree assault (Count XII).

At Knox's arraignment on the second amended information, defense counsel stated:

> We acknowledge receipt of the second amended Information. We'll waive reading, and stipulate the probable—all of the charges, the Court has already found probable cause on, and I anticipate a guilty plea to all the charges in the second amended Information.

Verbatim Rep. of Proc. (VRP) (Jan. 5, 2024) at 189.

At the same hearing, Knox pleaded guilty to all nine counts. Defense counsel noted that on three of the counts, specifically the two second degree attempted murder charges (Counts III

---

[5] The counts in the second amended information are not numbered sequentially. In a first amended information, the State had charged Knox with 18 counts, which it later changed to the nine counts charged in the second amended information. The numbering scheme was a result of a county procedural rule regarding the renumbering of counts.

and XI) and the first degree assault charge (Count XII), Knox was "doing an *Alford*[6] plea as to the mens rea." VRP (Jan. 5, 2024) at 188. Defense counsel stated:

> We're conceding that the shots were fired, and they were shot—they were fired in the direction of the victims. It's been our contention since the beginning that he did not intend to kill anyone. However, I think that's ultimately a jury question, and Mr. Knox is pleading guilty in order to take advantage of the plea agreement as to the mens rea element. But as to the actus reus of shooting in their direction, we're not disputing that.

VRP (Jan. 5, 2024) at 196.

On his statement of defendant on plea of guilty, Knox attached an appendix to describe in his own words what made him guilty of his charges. On the preprinted statement form, Knox had an option to check a box that stated: "Instead of making a statement, I agree that the court may review the police reports and/or a statement of probable cause supplied by the prosecution to establish a factual basis for the plea." CP at 140. Knox did not check that box.

In the appendix, Knox wrote, in pertinent part:

> On July 22, 2022, I assaulted my girlfriend, [K.H.], causing substantial bodily injury and took her purse from her by the use of force in Kitsap County, WA.
>
> . . . .
>
> On July 24, 2022, while running away from the accident scene and with the intent of effectuating my escape, I pointed the aforementioned firearm at Andrea Wiren, forced her out of her vehicle, and stole her vehicle in Kitsap County, WA. At the same time, I also pointed my firearm at her passengers, Jordan Carson and William Porterfield.

CP at 142.

---

[6] *See generally North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

After confirming that Knox knowingly, voluntarily, and intelligently entered into the plea agreement, the trial court accepted the plea agreement and Knox's guilty plea. The trial court also confirmed that Knox freely and voluntarily signed the statement on plea of guilty. The trial court noted that the appendix where Knox described his crimes was "to determine the factual basis" for his plea. VRP (Jan. 5, 2024) at 196. The trial court further stated: "And I did, as I said, read all of the police reports that were . . . presented as well, and I do find that there is a factual basis for your plea." VRP (Jan. 5, 2024) at 197.

2.    Sentencing

The trial court sentenced Knox in April 2024. Both Knox and the State filed sentencing memorandums.

During the sentencing hearing, the State requested an exceptional upward sentence of 825 months in total confinement, which was the top end of the standard sentencing range plus an additional 120 months. The State argued that based on Knox's criminal history, current offenses, and the operation of the offender score based on Knox's criminal history, his standard sentencing range functionally only accounted for his three serious violent crimes rather than the nine crimes he committed

Knox requested the trial court impose a mitigated exceptional sentence downward. Knox argued that if the trial court adopted the State's recommendation, he would serve a functional life sentence. Knox further argued that the trial court was authorized to consider his difficult childhood, which he had detailed extensively in his sentencing memorandum, and that three mitigating factors under RCW 9.94A.535(1) applied to his circumstances. Specifically, Knox contended he committed his crimes "under duress, coercion, threat, or compulsion insufficient to

8

constitute a complete defense, but which significantly affected his . . . conduct" (RCW 9.94A.535(1)(c)); his capacity to appreciate the wrongfulness of his conduct was significantly impaired (RCW 9.94A.535(1)(e)); and the operation of the multiple offense policy in RCW 9.94A.589 resulted in excessive presumptive sentence (RCW 9.94A.535(1)(g)). VRP (Apr. 15, 2024) at 269.

The trial court then heard victim impact statements from several of the officers involved in the events of July 24, 2022, as well as statements of support from Knox's family and friends. Knox also exercised his right of allocution.

In sentencing Knox, the trial court stated that it had reviewed the facts of the case, and it acknowledged the victim impact statements and family support statements. The trial court also acknowledged the respective sentencing requests from Knox and from the State. The trial court reviewed the goals of the Sentencing Reform Act (SRA) of 1981, ch. 9.94A RCW, and stated: "[I]n looking at the purposes of . . . sentencing, ensuring the sentence is proportionate to the seriousness of the offense and commensurate with punishment imposed on others committing similar offenses, the Court is not convinced that sentencing an additional 10 years above the maximum actually meets that goal." VRP (Apr. 15, 2024) at 278. The trial court declined the State's request to impose an exceptional upward sentence.

The trial court then noted its authority to consider Knox's difficult history and expressed its sympathy for Knox's background. However, based on the magnitude of Knox's conduct, which included "carjack[ing] innocent bystanders" and "shooting several times at officers over several hours," the trial court found that Knox's actions did not warrant an exceptional downward

9

sentence. VRP (Apr. 15, 2024) at 279-80. The trial court sentenced Knox within the standard sentencing range, for a total of 600 months.

Knox appeals.

## ANALYSIS

Knox argues that his convictions for second degree assault and first degree robbery against K.H. (Counts I and II) and his convictions for second degree assault and first degree robbery against the carjacking victims (Counts VII and VIII) violate double jeopardy. Knox also argues that the trial court abused its discretion for allegedly failing to consider his request for an exceptional downward sentence. Finally, Knox advances six additional grounds for appeal in a SAG.

A.     DOUBLE JEOPARDY

1.     Legal Principles

The United States and Washington constitutions provide that no person shall be "twice put in jeopardy" for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The constitutional guarantee against double jeopardy protects both against a second trial for the same offense and multiple punishments for the same offense. *State v. Ray*, 5 Wn.3d 350, 361-62, 575 P.3d 321 (2025). Here, at issue is whether the State has imposed multiple punishments on Knox for the same offense.

The double jeopardy clause "'does not prohibit the imposition of *separate punishments* for *different offenses*.'" *Id.* at 362 (emphasis in original) (quoting *State v. Arndt*, 194 Wn.2d 784, 817, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021)). Thus, in multiple punishment cases, courts must determine if a defendant's convictions punish the same offense twice or instead punish

two different offenses. *Id.* Double jeopardy is violated only if the convictions punish the same offense twice. *Id.*

In a multiple punishments context, the key question is whether the legislature intended to impose separate punishments. *Arndt*, 194 Wn.2d at 815. "'If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended.'" *Id.* at 815-16 (quoting *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005)). "'[L]egislative intent is the touchstone.'" *Ray*, 5 Wn.3d at 363 (internal quotation marks omitted) (quoting *State v. Muhammad*, 194 Wn.2d 577, 616, 451 P.3d 1060 (2019) (plurality opinion) (separate opinion of Gordon McCloud, J., with Stephens and Yu, JJ. concurring)).

To determine legislative intent when the convictions arise under different statutory provisions, courts employ a four-part analysis. *Id.* First, courts consider whether there is any "express or implied articulation of legislative intent." *Arndt*, 194 Wn.2d at 818. "Evidence of legislative intent may be clear on the face of the statute, found in the legislative history, the structure of the statutes, the fact the two statutes are directed at eliminating different evils, or any other source of legislative intent." *Freeman*, 153 Wn.2d at 773.

If legislative intent is not clear, then courts apply the *Blockburger*[7] test. *Ray*, 5 Wn.3d at 364; *see also In re Pers. Restraint of Orange*, 152 Wn.2d 795, 818, 100 P.3d 291 (2004). Under the *Blockburger* test, two offenses must be the same both in law and in fact to qualify as the "'same offense'" for double jeopardy purposes. *Ray*, 5 Wn.3d at 368 (internal quotation marks omitted) (quoting *Arndt*, 194 Wn.2d at 815).

---

[7] *See generally Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

"'[W]here *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not.'" *Arndt*, 194 Wn.2d at 818 (emphasis in original) (alteration in original) (internal quotation marks omitted) (quoting *Orange*, 152 Wn.2d at 817). This does not mean comparing statutory elements of the offenses at an abstract level. *Ray*, 5 Wn.3d at 367. Instead, "when applying *Blockburger*, we must consider the legal elements of each offense 'as charged *and proved*' at trial." *Id.* at 367-68 (emphasis in original) (quoting *Muhammad*, 194 Wn.2d at 620).

If, under the *Blockburger* test, the two offenses are not the same in law and in fact, there is a strong presumption the legislature has authorized separate punishments for both offenses. *Id.* at 367. On the other hand, if the *Blockburger* test indicates the two offenses are the same in law and in fact, courts strongly presume the legislature intended to prohibit separate punishments. *Id*. at 364, 367.

If the *Blockburger* test is not dispositive, courts then apply the merger doctrine. *Arndt*, 194 Wn.2d at 819. Under the merger doctrine, "'when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.'" *Id.* (quoting *Freeman*, 152 Wn.2d at 772-73). In such cases, to prove the particular degree of a crime, "'the State must prove not only that a defendant committed that crime . . . but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes.'" *Freeman*, 153 Wn.2d at 778 (quoting *State v. Vladovic*, 99 Wn.2d 413, 421, 662 P.2d 853 (1983)). In cases of assault and robbery,

> to prove first degree robbery as charged and proved by the State, the State [must] prove the defendant[] committed an assault in furtherance of the robbery. As

charged and proved, without the conduct amounting to assault, [the defendant] would be guilty of only second degree robbery. Under the merger rule, assault committed in furtherance of a robbery merges with robbery and without contrary legislative intent or application of an exception, these crimes would merge.

*Id.* (citations omitted). Similar to the *Blockburger* test, a merger analysis requires consideration of how the offenses were charged. *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 523-24, 242 P.3d 866 (2010).

However, "the merger doctrine is applicable *only* in cases involving lesser included offenses." *Ray*, 5 Wn.3d at 364 (emphasis in original). This is distinct from circumstances that are present here where the *degree* of an offense is raised from conduct criminalized under a different statutory provision, i.e., second degree assault and first degree robbery. *See, e.g.*, *Francis*, 170 Wn.2d at 524-25; *Freeman*, 153 Wn.2d at 772-73, 776.

Finally, courts look for "'clear evidence of contrary intent' in the legislative history and statutory context" to overcome any presumptions arising from the *Blockburger* test or application of the merger doctrine. *Ray*, 5 Wn.3d at 372 (quoting *State v. Calle*, 125 Wn.2d 769, 780, 888 P.2d 155 (1995)).

A claim of double jeopardy is a question of law that we review de novo. *Arndt*, 194 Wn.2d at 815. Furthermore, a claim of double jeopardy may be raised for the first time on appeal. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); RAP 2.5(a)(3). While guilty pleas typically insulate a defendant's convictions from collateral attack, the act of pleading guilty does not waive a double jeopardy challenge. *Francis*, 170 Wn.2d at 522; *State v. Knight*, 162 Wn.2d 806, 811-12, 174 P.3d 1167 (2008). Accordingly, a conviction entered pursuant to a guilty plea can still violate double jeopardy if the record clearly shows a double jeopardy violation. *Knight*, 162 Wn.2d at 812. The appropriate remedy in such cases is to vacate the lesser of the two convictions that

violate double jeopardy. *State v. Trujillo*, 112 Wn. App. 390, 411-12, 49 P.3d 935 (2002), *review denied*, 149 Wn.2d 1002 (2003); *see Francis*, 170 Wn.2d at 524-25.

2.      Assault and Robbery of K.H. (Counts I and II)

Knox argues that under both the *Blockburger* test and merger doctrine, his assault of K.H. and robbery of K.H. violate double jeopardy. We disagree.

a.      Legislative intent

In *Freeman*, our Supreme Court found that there is "no evidence that the legislature intended to punish second degree assault separately from first degree robbery when the assault facilitates the robbery." 153 Wn.2d at 776. However, this is not dispositive as "a case by case approach is required to determine whether first degree robbery and second degree assault are the same for double jeopardy purposes." *Id.* at 780.

b.      *Blockburger* test

Knox argues that his assault against and robbery of K.H. are the same in law and in fact. We disagree that Knox's second degree assault and first degree robbery convictions are the same in law.

As discussed above, the second step of the double jeopardy analysis is to apply the *Blockburger* test. We must consider "'whether each provision requires proof of a fact which the other does not.'" *Arndt*, 194 Wn.2d at 818 (emphasis omitted) (quoting *Orange*, 152 Wn.2d at 817). "If the to-convict elements for each offense 'would not be sufficient to sustain a conviction under the other,' they are not the same in law." *Ray*, 5 Wn.3d at 370 (internal quotation marks omitted) (quoting *Orange*, 152 Wn.2d at 816).

Here, first degree robbery[8] requires proof of facts—specifically, the taking of the property of another—that second degree assault[9] does not. RCW 9A.56.190; RCW 9A.56.200(1)(a)(iii); RCW 9A.36.021(1)(a). Also, second degree assault requires an intentional assault that recklessly inflicts *substantial* bodily injury, whereas first degree robbery requires only the infliction of bodily injury in the course of a robbery. *See* RCW 9A.36.021(1)(a); RCW 9A.56.200(1)(a)(iii). Thus, the offenses are not the same in law. *Arndt*, 194 Wn.2d at 818; *see also Freeman*, 153 Wn.2d at 776. Because the offenses are not the same in law, Knox's assault and robbery of K.H. are presumptively not the same offense for double jeopardy purposes. *Ray*, 5 Wn.3d at 368.

---

[8] "A person is guilty of robbery in the first degree if . . . [i]n the commission of a robbery or of immediate flight therefrom, he or she: . . . [i]nflicts bodily injury." RCW 9A.56.200(1)(a)(iii). Robbery is defined as:

> [when] [a] person unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

RCW 9A.56.190.

[9] "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a).

c.      Merger

In the third step of the double jeopardy analysis, we consider whether Knox's convictions

for second degree assault and first degree robbery against K.H. merge. *Arndt*, 194 Wn.2d at 819.

We conclude that the convictions do not merge.[10]

In determining whether the two convictions merge, we first look to how the State charged

and proved Knox's offenses. *Francis*, 170 Wn.2d at 523-24; *Freeman*, 153 Wn.2d at 778-79.

Based on the charging document, it is not clear if the assault in Count I was intended to raise the

degree of the robbery in Count II. Knox insists the assault in Count I "was the only act by which

[he] used force to take a purse and a phone from [K.H.]," thus the assault was necessary to establish

the degree of the robbery charge. Br. of Appellant at 28-29. Conversely, the State argues that

because Knox "assailed [K.H.] multiple times," the convictions do not merge. Br. of Resp't at 16.

Second degree assault (Count I) as charged in the second amended information stated: "On

or about July 22, 2022 . . . David Alexander Knox did intentionally assault another, to-wit: [K.H.],

and thereby recklessly inflicted substantial bodily harm." CP at 71. First degree robbery (Count

II) provided:

---

[10] Our Supreme Court recently articulated the merger doctrine in *Ray*, where it stated that "the merger doctrine is applicable *only* in cases involving lesser included offenses." 5 Wn.3d at 364 (emphasis in original). This is distinct from circumstances when the *degree* of an offense is raised from conduct criminalized under a different statutory provision, i.e., second degree assault and first degree robbery. *See, e.g.*, *Francis*, 170 Wn.2d at 524-25; *Freeman*, 153 Wn.2d at 770-771, 776;.

In our review of *Ray*, however, we question whether the Supreme Court intended to disavow application of the merger doctrine in cases when the degree of an offense is raised by conduct separately criminalized. We reach this question based on the cases *Ray* relies upon in its discussion of merger. 5 Wn.3d at 364 (citing *State v. Arndt*, 194 Wn.2d at 815-16); *see also Muhammad*, 194 Wn.2d at 618 (separate opinion of McCloud, J., with Stephens and Yu, JJ. concurring).

> On or about July 22, 2022 . . . David Alexander Knox did, with intent to commit theft thereof, unlawfully take personal property [he] did not own from the person of another, to-wit: [K.H.], or in said person's presence against said person's will by the use or threatened use of immediate force . . . and in the commission of said crime or in immediate flight therefrom, . . . Knox inflicted bodily injury.

CP at 74. The State did not specify a location of the assault (inside or outside the store) that is the basis for the robbery charge; thus, the assault charge could have been used to elevate the degree of the robbery charge, or the assault charge could have been based on different conduct from that on which the robbery charge is based. Given the different possible interpretations that arise from the charging document, the way in which the State charged Knox, and in light of the conduct at issue, whether the crimes merge is ambiguous. Thus, we look to whether the commission of one crime had an independent purpose or effect from the commission of the other. *Freeman*, 153 Wn.2d at 778-79.

The key question is whether Knox's assault of K.H. was purely to facilitate his robbery of K.H. *Id.* at 779. "[O]ffenses may in fact be separate when there is a separate injury to 'the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.'" *Freeman*, 153 Wn.2d at 778-79 (quoting *State v. Frohs*, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)).

Here, the record shows that while inside the store, Knox "shoved [K.H.] in the face forcibly enough to cause her to fall over and strike the shelf behind." CP at 87. Knox makes no move to take anything belonging to K.H.; instead, he assists K.H. to her feet and assures a store employee that nothing was amiss. K.H. then exits the store to flee from Knox, but a few minutes later, Knox confronts her again outside the store. Knox shoves K.H. to the ground and walks away. He then returns to shove her to the ground again and begins punching and kicking K.H. in the face and

body. Knox walks away again, apparently to move his car, and when K.H. attempted to grab her belongings from his car, he exited his vehicle and started shoving her. Then, another woman intervened and approximately a whole minute passes where Knox does not assault K.H. When K.H. again attempted to take her belongings from Knox's car, Knox began "to pummel her with his hands and feet for approximately two minutes" before grabbing her purse and fleeing. CP at 87.

The evidence here shows at least one assault—the assault inside the store—was separate from an assault to facilitate the robbery. The evidence also points to Knox assaulting K.H. for the sake of assaulting her while outside the store as well, not to facilitate the taking of her purse. Thus, the record shows there was at least one assault "separate and distinct" from the assault that facilitated the robbery, and the merger does not apply. *Freeman*, 153 Wn.2d at 778.

> d. "Other indicators of legislative intent"

The fourth step in the double jeopardy analysis requires consideration of "'other indicators of legislative intent'" for clear evidence of the legislature's intent to prohibit separate punishments. *Ray*, 5 Wn.3d at 364 (quoting *Muhammad*, 194 Wn.2d at 621). As discussed above, neither the second degree assault statute nor the first degree robbery statute provides an indication as to the legislature's intent to impose or to prohibit separate punishments. *See Freeman*, 153 Wn.2d at 776, 780. We note that both assault and robbery are criminalized in different chapters of the RCW, which indicates the legislature's intent to "'protect different societal interests' and authorize separate punishment." *Ray*, 5 Wn.3d at 373 (quoting *Arndt*, 194 Wn.2d at 820). However, as in *Ray*, this is not a "sufficiently clear" indicator of legislative intent. *Id.*

In sum, in applying the four-part analysis to determine a double jeopardy violation, we conclude that there is no double jeopardy violation involving Knox's convictions for second degree assault (Count I) and first degree robbery (Count II) against K.H.

### 3. Assault and Robbery of Carjacking Victims

Knox argues that his robbery of Wiren, the driver (Count VII), and assault of Porterfield and Carson, the passengers (Count VIII), are the same in law and in fact. Specifically, Knox asserts that the probable cause statement and his statement accompanying his guilty plea regarding the carjacking established only "a single course of assaultive conduct" because "there was no separate act of assault and of taking property." Br. of Appellant at 23, 24. The State argues there is no double jeopardy violation because the two charges are against different victims. We agree with the State.

Here, in the second amended information, the State charged Knox with first degree robbery for the incident involving only Wiren (Count VII). The State charged Knox with second degree assault against Porterfield and Carson (Count VIII); Wiren was not included as a victim. Knox's written statement regarding Counts VII and VIII stated:

> On July 24, 2022, while running away from the accident scene and with the intent of effectuating my escape, I pointed the aforementioned firearm at Andrea Wiren, forced her out of her vehicle, and stole her vehicle in Kitsap County, WA. At the same time, I also pointed my firearm at her passengers, Jordan Carson and William Porterfield.

CP at 142.

Generally, "[o]ffenses arise from separate and distinct conduct when they involve separate victims." *Orange*, 152 Wn.2d at 821; *accord State v. Baldwin*, 150 Wn.2d 448, 457, 78 P.3d 1005 (2003) (stating "when offenses harm different victims, the offenses are not factually the same for

19

purposes of double jeopardy"). Thus, because the robbery charge in Count VII pertains only to Wiren and assault charge in Count VIII pertains to Porterfield and Carson, the offenses are not factually identical. *Baldwin*, 150 Wn.2d at 457.

Knox fails to address the fact that the charging document alleges different victims. Knox attempts to liken his circumstances to those found in *State v. Kier*, another carjacking case where the defendant was charged with first degree robbery and second degree assault against a car driver and passenger. 164 Wn.2d 798, 803, 194 P.3d 212 (2008).

In *Kier*, our Supreme Court held that the defendant's second degree assault conviction merged into his first degree robbery conviction. *Id.* at 814. However, *Kier* is distinguishable. In *Kier*, the defendant was charged with first degree robbery against *both* the car driver and passenger, and with second degree assault against the passenger only. *Id.* at 803. The matter went to a jury trial, and due to an ambiguity regarding the victims in the jury instructions and based on the evidence presented during trial, our Supreme Court held that "[t]he rule of lenity therefore requires the merger of [the defendant's] second degree assault conviction into his first degree robbery conviction." *Id.* at 814. Our Supreme Court further stated: "We do not rule out the possibility that, in the course of a robbery, a separate assault on a victim may occur." *Id.*

Here, there is no overlap in victims between Count VII and Count VIII. Furthermore, probable cause statement and police reports aside, Knox's written statement provides a factual basis for his plea: Knox pointed a firearm at Wiren in order to facilitate the taking of her car and Knox separately pointed a firearm at Porterfield and Carson. Because Counts VII and VIII pertain to different victims, the offenses are not factually the same for the purposes of double jeopardy.

20

*Baldwin*, 150 Wn.2d at 457. Accordingly, we hold there is no double jeopardy violation with Knox's assault and robbery convictions involving the carjacking victims.

B.     MITIGATED SENTENCE REQUEST

Knox argues that the trial court "misapprehended the law" when it rejected his request for a mitigated sentence. Br. of Appellant at 32. Knox claims the trial court sentenced him without considering his mitigating evidence. We disagree.

1.     Legal Principles

A criminal defendant may not appeal a sentence within the standard range. RCW 9.94A.585(1); *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). However, a defendant may challenge "the underlying legal determinations by which the sentencing court reaches its decision." *McFarland*, 189 Wn.2d at 56. Also, "every defendant is entitled to have an exceptional sentence actually considered" if it is requested. *Id.* A sentencing court may impose a sentence below the standard range if it finds "'substantial and compelling' mitigating circumstances, 'established by a preponderance of the evidence.'" *State v. McFarland*, 18 Wn. App. 2d 528, 538, 492 P.3d 829 (2021) (quoting RCW 9.94A.535(1)).

Mitigating circumstances may include cases when a "defendant committed the crime under duress, coercion, threat, or compulsion insufficient to constitute a complete defense but which significantly affected his . . . conduct." RCW 9.94A.535(1)(c). Additionally, courts may consider if a "defendant's capacity to appreciate the wrongfulness of his . . . conduct, or to conform his . . . conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded." RCW 9.94A.535(1)(e).

"A trial court abuses discretion when 'it refuses categorically to impose an exceptional sentence below the standard range under any circumstances.'" *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) (quoting *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997), *review denied*, 136 Wn.2d 1002 (1998)). The failure to exercise discretion constitutes reversible error. *State v. O'Dell*, 183 Wn.2d 680, 697, 358 P.3d 359 (2015).

2.      No Abuse of Discretion

Here, the record shows that at the sentencing hearing, defense counsel argued for a mitigated sentence based on both RCW 9.94A.535(1)(c) and RCW 9.94A.535(1)(e), as well as Knox's childhood experiences. Knox submitted a nearly 40-page sentencing memorandum that included a forensic psychological report.

After hearing from the parties, the trial court reviewed the facts of the case, and it acknowledged both the victim impact statements and statements in support of Knox. The trial court stated: "I've read the very detailed history of [Knox's] life. And I agree that he started out in life with the cards stacked against him. But today, I'm asked by the State to give an exceptional sentence up, and by the Defense to give an exceptional down." VRP (Apr. 15, 2024) at 277.

The trial court discussed the purposes of the SRA. Based on its articulation of the purposes of the SRA, the trial court declined the State's request for an exceptional upward sentence. The trial court then addressed Knox's request for a mitigated sentence:

> As to the Defense request for an exceptional sentence down, the Court can . . . consider Mr. Knox's past in making its decision. It is clear, Mr. Knox, that you probably had no choice but to go . . . into a hole of crime having a parent who I believe was a gang member, being abandoned, parents who used drugs and committed crimes themselves, but at some point you needed to stop having the excuse and choose to break that cycle. You've been to prison before, and if you had decided then that that was something you did not want to do there again, you could have done something about it. No, you didn't get the options that a lot of

22

people get . . . through our courts these days. You didn't get the opportunities for Drug Court and treatment and different things like that because of your criminal history . . . .

. . . .

However, . . . [t]his is a situation where . . . not even looking at what happened on the 22nd, but on the 24th, and on the 24th over several hours you went from—you were fleeing in a car, you abandoned—you crashed your vehicle, you shot at officers there, and then you carjacked innocent bystanders at gunpoint, shooting into the air, making them realize you were serious, and then going on to a house where you were shooting at several—shooting several times at officers over several hours, and then fleeing from there and going on and shooting again at officers. This—this is not the activity, the actions that warrant an exceptional sentence down.

. . . .

I think your attorney said in his sentencing memorandum if I sentenced you with the standard ranges, the Court was basically giving up on you. Well, I don't see it that way. The Court is not giving up on you. The Court is recognizing that you have had a rough life, you've made some very bad choices, and I'm sentencing you commensurate with those choices.

VRP (Apr. 15, 2024) at 278-80.

Based on the trial court's colloquy, it is clear from the record the trial court had no misapprehension of the law or what it could consider when sentencing Knox. In fact, the trial court provided a thoughtful and extensive ruling. The record shows the trial court understood that it could consider Knox's childhood—and indeed, the trial court referenced Knox's difficult past. While the trial court did not explicitly reference RCW 9.94A.535(1)(c) and RCW 9.94A.535(1)(e), the trial court acknowledged that Knox "probably had no choice but to go . . . into a hole of crime having a parent who . . . was a gang member, being abandoned, [and] parents who used drugs and committed crimes themselves." VRP (Apr. 15, 2024) at 278.

23

The record also shows that the trial court read and considered the defense's sentencing memorandum, which argued mitigating factors under RCW 9.94A.535 and included a forensic psychological report. Thus, it is reasonable to infer that the trial court did consider Knox's failed diminished capacity defense, despite not using specific language. It is evident from the record that the trial court was strongly persuaded by the events of July 24, 2022, based on the trial court's recounting of events. Nothing in the record suggests the trial court failed or refused to fully consider Knox's request or believed it lacked certain sentencing authority. *Grayson*, 154 Wn.2d at 342. Therefore, the trial court did not abuse its discretion when it sentenced Knox.

C.      STATEMENT OF ADDITIONAL GROUNDS (SAG)

Knox advances six additional grounds for review in a SAG. RAP 10.10. This opinion addresses each additional ground in turn.

1.      Ground 1: Ineffective Assistance of Counsel

Knox claims he received ineffective assistance of counsel when, during two separate hearings, defense counsel first "disclosed to the courts his own ineffective assistance of counsel" and later stated, "'I'm not focused on Mr. Knox right now, I'm focused on the Care[a]ga murder.[']" SAG at 1 (quoting VRP (Aug. 3, 2023) at 155). We disagree.

a.      Legal principles

Criminal defendants have the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). Courts presume counsel is effective. *Id.* To demonstrate ineffective assistance of counsel, a defendant must show that (1) defense counsel's representation was deficient, and (2) defense counsel's deficient representation prejudiced the defendant. *Id.* at 247-48.

Counsel's performance is deficient when it "falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). The defendant bears the burden of demonstrating that counsel had no legitimate or tactical reason for his or her conduct. *Vazquez*, 198 Wn.2d at 248. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

If a defendant establishes deficient performance, courts must next assess whether that performance was prejudicial. *State v. Lopez*, 190 Wn.2d 104, 116, 410 P.3d 1117 (2018). "'Prejudice exists if there is a reasonable probability that but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* (internal quotation marks omitted) (quoting *Estes*, 188 Wn.2d at 458). "If either element of the test is not satisfied, the inquiry ends." *Kyllo*, 166 Wn.2d at 862.

### b. No ineffective assistance

First, Knox claims defense counsel "disclosed" his own ineffective assistance during a hearing held on August 21, 2023. SAG at 1. Knox highlights a colloquy by defense counsel. Review of defense counsel's colloquy demonstrates that defense counsel did not, in fact, "disclose" his own ineffective assistance of counsel.

The record shows that the State had filed an unexpected motion to exclude the testimony of a potential defense expert witness when the State was aware that defense counsel was out of town, without access to email or internet. The original purpose of the hearing was to address a different motion entirely. The parties ultimately disputed what defense counsel called "the State's

desire to push this case to trial on an expedited basis." VRP (Aug. 21, 2023) at 4. During a colloquy, defense counsel stated: "The State appears to me to be trying to push me into providing ineffective assistance of counsel." VRP (Aug. 21, 2023) at 4.

As to the timing of Knox's trial, defense counsel further stated:

I can provide effective assistance of counsel to Mr. Knox and guide him through his Fifth and Sixth Amendment rights regarding an independent evaluation. But I don't understand why we're pushing this case the way it's being pushed, why there [has] been [a motion] to shorten time filed in this case.

. . . .

I don't understand why they're handling it this way. It's like they're asking this case to go to trial with an ineffective attorney. I pride myself on being prepared for my cases. But when I have two major cases that I'm preparing at the same time, I cannot adequately prepare both of them to the point that these cases require.

I have made the decision for a variety [of] reasons to concentrate on the Careaga murder. And just for the record, that case involves four dead victims, three defendants, I believe we're at 12 Class A offenses on that case, and my client is looking at four consecutive sentences of life without the possibility of parole on that case.

That is scheduled for September 5. Mr. Knox is scheduled for trial on September 11. . . . I will be in the courthouse on September 11. If the Court orders me to be in front of Your Honor on Mr. Knox's case, I will be here, and I will provide ineffective assistance.

VRP (Aug. 21, 2023) at 5-6.

The record clearly shows that defense counsel is advocating for a timeline for Knox's proceedings that will allow him to provide effective assistance. Defense counsel's statement, "I will provide ineffective assistance," is within the context of and contingent upon the trial court adopting the State's position in keeping firm the September 11 trial date. This is a legitimate and reasonable position for defense counsel to take; thus, when considering all the circumstances,

26

defense counsel's conduct does not fall below an objective standard of reasonableness. *Vazquez*, 198 Wn.2d at 248; *Estes*, 188 Wn.2d at 458.

Next, Knox points to another statement made by defense counsel during an earlier hearing as evidence of ineffective assistance of counsel. Defense counsel stated: "I'm not focused on Mr. Knox right now. I'm focused on the Careaga murder." VRP (Aug. 3, 2023) at 155.

Review of the record shows that Knox has taken defense counsel's statement out of context. In the context of a scheduling discussion, defense counsel stated:

> We're in no rush on this case. I'm going to be honest with the Court. [The prosecutor] may have the liberty of only having one case, I don't. I'm not focused on Mr. Knox right now. I'm focused on the Careaga murder. I'm working full-time preparing for that trial, which is scheduled for September 5th. If the State wants to strike the briefing schedule and reset it, that's fine, but they're not going to talk to my client, Mr. Knox, until we have this issue resolved, and . . . we have orders from the Court.

VRP (Aug. 3, 2023) at 155-56. Defense counsel was serving as defense counsel in a quadruple homicide murder trial, known as the "Careaga" trial, which had been set to begin the week before Knox's trial. Defense counsel anticipated that the Careaga trial would take up to three months, thus posing an issue with the timing of Knox's trial.

This is a legitimate position for defense counsel to take, and similar to the discussion above, defense counsel's statement was made within the context of advocating to have enough time to adequately prepare for Knox's case. Such conduct does not fall below an objective standard of reasonableness. *Estes*, 188 Wn.2d at 458.

Because defense counsel's comments do not fall below an objective standard of reasonableness, defense counsel's performance cannot be said to be deficient. *Kyllo*, 166 Wn.2d

at 862.  Because counsel did not perform deficiently, we hold that Knox's claim of ineffective assistance fails.

2.      Ground 2 and Ground 3: Exclusion of Expert Testimony and Violation of Right to Present a Defense

For Ground 2, Knox claims that the trial court abused its discretion when it excluded expert witness testimony regarding Knox's alleged diminished capacity.  For Ground 3, Knox claims that the exclusion of that expert testimony violated his constitutional right to present a defense.  We disagree with both claims.

a.      Legal principles

A diminished capacity defense allows defendants to argue that they are not guilty based on "'a mental disorder . . . [that] impaired [their] ability to form the culpable mental state to commit the crime charged.'" *State v. Snider*, 199 Wn.2d 435, 438, 508 P.3d 1014 (2022) (alteration in original) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).  The defense requires an expert diagnosis of a mental disorder, along with expert testimony connecting the mental disorder with an inability to form a culpable mental state.  *Id.*; *Atsbeha*, 142 Wn.2d at 921 ("The opinion concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged.").

Admissibility of diminished capacity testimony is governed by ER 401, ER 402, and ER 702.  *Atsbeha*, 142 Wn.2d at 921.  Relevant evidence is any evidence that makes a material fact more or less probable than it would be without the evidence.  ER 401.  All relevant evidence is admissible, and irrelevant evidence is inadmissible.  ER 402.  ER 702, which governs expert witness testimony, provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "[E]xpert testimony will be considered helpful to the trier of fact only if its relevance can be established." *Atsbeha*, 142 Wn.2d at 921.

To use the diminished capacity defense, it is not enough that a defendant suffers from a particular mental disorder. *Id.* "The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime." *Id.* Appellate courts review a trial court's evidentiary rulings for abuse of discretion "and defer to those rulings unless 'no reasonable person would take the view adopted by the trial court.'" *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017) (internal quotation marks omitted) (quoting *Atsbeha*, 142 Wn.2d at 914).

Criminal defendants have the right to present testimony in their defense. U.S. CONST. AMEND. VI; WASH. CONST. art. I, § 22. "If the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense." *Clark*, 187 Wn.2d at 648-49; *accord State v. Carte*, 27 Wn. App. 2d 861, 877, 534 P.3d 378 (2023) ("We engage in a two-step review process to review the trial court's individual evidentiary rulings for an abuse of discretion and then consider de novo the constitutional question of whether these rulings deprived the defendant of their Sixth Amendment right to present a defense."), *review denied*, 2 Wn.3d 1017 (2024).

b.     No evidentiary error and no violation of right to present a defense

i.     Exclusion of expert testimony

The record shows that before Knox pleaded guilty, he intended to raise a diminished capacity defense as to some of his charges—specifically, four counts of second degree attempted murder and five counts of first degree assault.

Knox's diminished capacity defense was based on a forensic psychological evaluation performed by Dr. David Dixon, a licensed clinical and forensic psychologist. The report detailed Knox's difficult childhood and troubled history, which included childhood abuse and drug use from an early age. The report concluded that Knox has "an underlying mental health condition," the symptoms of which are exacerbated by drug use. CP at 180. Specifically, Knox met the criteria for diagnoses of "Paranoid and Narcissistic Personality Disorder, . . . and Schizoaffective Disorder, Bipolar Type." CP at 180. The report further stated:

> At the time of the alleged crimes, Mr. Knox was highly impaired by a benzodiazepine, (Xanax), at a very high dosage, and also by IV amphetamine abuse. It appears he was in a drug induced blackout at the time of the shootings and other crimes committed two days after the DV incident. Although he describes amnesia for most of that timeframe, it is my opinion that Mr. Knox was affected by mania and paranoia related to Bipolar Disorder.
>
> Mr. Knox's mood was highly unstable and also swung into suicidal depression mentality. It is apparent his underlying mental disorder severely affected his judgement [sic] and reality. His longstanding mental illness, most accurately diagnosed as Schizoaffective Disorder, played a major role in his decisions made.
>
> It is my opinion that his thought process was to escape his predicament (fueled by paranoia), and that very possibly suicide was a real option. He fired the weapon in an effort to avoid capture. I do not believe his intent was to kill or injure anyone.
>
> Mr. Knox was in a fight or flight response process. Fight or flight is generally considered an autonomic physical response process that happens rapidly, and without cognitive consciousness. . . .

> In regards [sic] to [the specific intent crimes], I do not believe there was a specific intent to kill or cause great bodily harm. [Knox] was in a paranoid and manic state. This was . . . a direct role of mental illness, exacerbated by extreme intoxication of a psychoactive stimulant and sedative.

CP at 180-81.

The report states that Knox has an underlying mental disorder. Dr. Dixon wrote that "[Knox's] longstanding mental illness . . . played a major role in his decisions." CP at 180. Dr. Dixon further noted: "It is my opinion that his thought process was to escape his predicament (fueled by paranoia), and that very possibly suicide was a real option. He fired the weapon in an effort to avoid capture. I do not believe his intent was to kill or injure anyone." CP at 180.

However, to successfully raise a diminished capacity defense, the defendant's mental disorder must impair or prevent the defendant's ability to form the culpable mental state. *Snider*, 199 Wn.2d at 438; *State v. Atsbeha*, 142 Wn.2d at 921. And while Dr. Dixon stated that Knox was in a "fight or flight response," and that such a response occurs "without cognitive consciousness," Dr. Dixon's statement is contradicted—or at least rendered ambiguous—by the immediately preceding statements that Knox fired his weapon at police officers intending to "escape," "possibly [commit] suicide," and/or "avoid capture." CP at 180. Thus, Dr. Dixon instead gives an opinion as to what Knox was thinking at the time of his crimes, rather than an opinion about Knox's capacity to form the culpable mental state. The trial court noted as much:

> [Dr. Dixon is] basically making an opinion . . . that . . . would probably be . . . inadmissible because it's getting into [Knox's] thought process, not . . . addressing whether or not the mental disorder affected his capacity to form intent of any kind, and I think that's . . . what it is about.

VRP (Oct. 6, 2023) at 175.

31

The trial court further stated:

> And so, I mean, . . . based on what the Court has in front of it, the Court does not find that . . . Dr. Dixon's testimony would be helpful to get an argument in front of the jury for you, *I don't know that it would be helpful to the jury in determining whether or not [Knox] had the capacity to form intent*. And I know that . . . he's talked about the . . . fight-or-flight, but . . . the way that is described here, I just don't know that it's going to be helpful. . . . I'm cognizant that defendants have the right to defend their cases and they need to be able to defend their cases, and probably I could be still lenient just because . . . I want to do this, but I believe under the case law, I believe the way . . . this report is written that . . . there's insufficient evidence here that . . . supports a diminished capacity defense, and that . . . Dr. Dixon's testimony should be excluded. If you have something else another time, . . . but at this time, I'm going to have to exclude that testimony, because I . . . do not believe it meets the standard.

VRP (Oct. 6, 2023) at 176-77 (emphasis added).

"[E]xpert testimony will be considered helpful to the trier of fact only if its relevance can be established." *Atsbeha*, 142 Wn.2d at 921. Based on the findings within the forensic psychological report, Dr. Dixon's conclusions highlighted Knox's "other" intent in light of his mental disorder, not his *incapacity* to form the requisite intent based on his mental disorder. Thus, Dr. Dixon's testimony is not helpful because whether Knox had a *different intent* is simply not relevant. ER 702; ER 402; *Atsbeha*, 142 Wn.2d at 921. Therefore, we hold the trial court did not abuse its discretion when it excluded testimony regarding a diminished capacity defense.

ii.      Right to present defense

Next, we consider de novo whether exclusion of this testimony violated Knox's constitutional right to present a defense. *Clark*, 187 Wn.2d at 648-49. A defendant's right to present a defense is not absolute and is limited by the rules of evidence. *Carte*, 27 Wn. App. 2d at 877. A defendant does not have the right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d

713, 720, 230 P.3d 576 (2010) (stating "[e]vidence that a defendant seeks to introduce 'must be of at least minimal relevance'" (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002))).

Here, the key question is whether the trial court's exclusion of Dr. Dixon's testimony eliminated Knox's entire defense. *Carte*, 27 Wn. App. 2d at 879. "[W]hen the defendant has an opportunity to present his theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." *State v. Ritchie*, 24 Wn. App. 2d 618, 635, 520 P.3d 1105 (2022), *review denied*, 1 Wn.3d 1006 (2023).

The record shows that Knox's theory of the case, at least as it pertained to his second degree attempted murder charges and first degree assault charges, was that he did not possess the required intent. He hoped to use a diminished capacity defense for those charges.

First, Knox is not entitled to present irrelevant evidence. *Jones*, 168 Wn.2d at 720. As we concluded in the preceding section, Dr. Dixon's testimony that Knox possessed a *different intent* is simply not relevant. Furthermore, while arguing diminished capacity is one way to defend against his attempted murder and assault charges, the exclusion of the diminished capacity defense did not preclude Knox from arguing during trial the mens rea elements of those charges. The State still needed to prove each element, including Knox's intent, beyond a reasonable doubt. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024).

Moreover, the trial court noted its exclusion of Dr. Dixon's testimony was ultimately based on the way "[the] report [was] written." VRP (Oct. 6, 2023) at 177. The trial court added, "If you have something else another time," implying that if Knox presented other evidence, whether from Dr. Dixon or another expert, demonstrating the required connection between a mental disorder and

capacity to form the culpable mental state, the trial court would potentially entertain that evidence. Knox never brought additional evidence.

Because the record shows that Knox still could have presented his theory of the case—that he did not possess requisite intent for certain charges—without a diminished capacity defense, we hold that the trial court did not violate Knox's constitutional right to present a defense.

### 3. Ground 4 and Ground 5: Trial Court Consideration of Mitigating Circumstances

For Ground 4, Knox claims that during sentencing, the trial court abused its discretion by not considering an exceptional downward sentence "base[d] upon the multiple offense policy of RCW 9.94A.589." SAG at 2. For Ground 5, Knox asserts the trial court abused its discretion "by not considering the exceptional sentence low based upon the mitigating circumstances of Mr. Knox's incomplete defense." SAG at 2. We disagree.

As to Ground 4, RCW 9.94A.535(1)(g) provides that a sentencing court may consider imposing an exceptional sentence below the standard sentencing range when "[t]he operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive."

Here, the record shows that Knox argued RCW 9.94A.535(1)(g) in his sentencing memorandum, stating that "[i]mposing a functional life sentence on a 33-year-old man when no one was hurt is not proportionate to the seriousness of the offense." CP at 154. During the sentencing hearing, defense counsel also argued RCW 9.94A.535(1)(g) to the trial court.

As discussed in section B.2 of the analysis above, the trial court reviewed the facts of Knox's case and acknowledged both the victim impact statements and family support statements. The trial court also noted the respective sentencing requests from Knox and from the State, along

with the goals of the SRA. Based on the goals of the SRA, the trial court declined the State's

request to impose an exceptional upward sentence. However, the trial court then directly addressed

Knox's mitigated sentence request based on the multiple offense policy:

> [Defense counsel] has asked me to consider the *Graham*[11] case, and I have read the *Graham* case. And . . . it was a situation in which law enforcement were being shot at. Six of them were shot at . . . by a fleeing defendant that lasted over . . . minutes, I think. It wasn't very long. In that case, he was sentenced to 82 years, and that was—came back and was sentenced to 23 years.
>
> However, this case is different. This is a situation where . . . not even looking at what happened on [July] 22nd, but on the 24th, and on the 24th over several hours you went from—you were fleeing in a car, you abandoned—you crashed your vehicle, you shot at officers there, and then you carjacked innocent bystanders at gunpoint, shooting into the air, making them realize you were serious, and then going on to a house where you were shooting at several—shooting several times at officers over several hours, and then fleeing from there and going on and shooting again at officers. This—this is not the activity, the actions that warrant an exceptional sentence down.

VRP (Apr. 15, 2024) at 279-80.

Thus, the record shows that the trial court did consider an exceptional downward sentence

based on the multiple offense policy under RCW 9.94A.535(1)(g). However, based on the

magnitude and severity of Knox's crimes, the trial court was not persuaded that Knox's standard

range sentence was excessive. Because the trial court considered Knox's request, we hold that it

did not abuse its discretion, and Knox's claim in Ground 4 fails.

Knox's fifth ground reiterates his counsel's argument regarding mitigating circumstances

when there has been a failed diminished capacity defense. For the reasons discussed above,

Knox's claim in Ground 5 fails.

---

[11] *State v. Graham*, No. 33642-5-III (Wash. Ct. App. Jan. 24, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/336425_unp.pdf.

4.      Ground 6: Concurrent vs. Consecutive Sentences

Knox claims the trial court abused its discretion "by not considering that it could sentence

Mr. Knox to a concurrent sentence instead of the consecutive sentence he received." SAG at 2.

Here, the trial court ordered that Knox's sentences on Count III (second degree attempted

murder), Count XI (second degree attempted murder), and Count XII (first degree assault) be

served consecutively.[12]

RCW 9.94A.589(1)(b) provides:

> Whenever a person is convicted of two or more serious violent offenses arising
> from separate and distinct criminal conduct, the standard sentence range for the
> offense with the highest seriousness level under RCW 9.94A.515 shall be
> determined using the offender's prior convictions and other current convictions that
> are not serious violent offenses in the offender score and the standard sentence
> range for other serious violent offenses shall be determined by using an offender
> score of zero. The standard sentence range for any offenses that are not serious
> violent offenses shall be determined according to (a) of this subsection. *All
> sentences imposed under this subsection (1)(b) shall be served consecutively to
> each other* and concurrently with sentences imposed under (a) of this subsection.
> Even if the court orders the confinement terms to run consecutively to each other,
> the terms of community custody shall run concurrently to each other, unless the
> court expressly orders the community custody terms to run consecutively to each
> other.

(Emphasis added); *accord Orange*, 152 Wn.2d at 821.

The record shows Knox pleaded guilty to "two or more serious violent offenses." RCW

9.94A.589(1)(b); RCW 9.94A.030(46).[13] Thus, the trial court did not have discretion to consider

---

[12] For Count III, Knox received 240 months. For Counts XI and XII, Knox received 120 months plus an additional 60-month firearm enhancement for each.

[13] "Serious violent offense" includes both second degree attempted murder and first degree assault. RCW 9.94A.030(46)(a)(iii), (a)(v), (a)(ix).

No. 59502-8-II

sentencing Knox to concurrent sentences for Count III, Count XI, and Count XII. Accordingly, we hold the trial court did not abuse its discretion.

CONCLUSION

We affirm Knox's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Price, J.